

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOHN DOE,<br><br>                    Plaintiff,<br><br>        vs.<br><br>OPPENHEIMER ASSET MANAGEMENT,<br>INC., OPPENHEIMER & CO., INC., BRIAN<br>WILLIAMSON and JOHN T. McGUIRE,<br><br>                    Defendants. | **14 CV 0779**<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

Plaintiff John Doe (a fictitious name), by his undersigned attorneys, alleges upon personal knowledge as to his own acts and experiences, and upon information and belief as to all other matters, based on the investigation conducted by and through Plaintiff's counsel, which included, among other things, a review of public documents and announcements issued by the U.S. Securities and Exchange Commission ("SEC") in connection with its investigation of the private placement of partnership interests in Oppenheimer Global Resource Private Equity Fund I, L.P. ("OGR Fund" or "Fund"), as well as non-public information provided to the SEC in connection with said investigation, as follows:

## NATURE OF THE ACTION

1.      This action arises out of Defendants' harassment, suspension and wrongful termination of John Doe (hereinafter, "DOE" or "Plaintiff") because of his opposition to a scheme hatched by the OGR Fund's Portfolio Manager, Defendant Brian Williamson ("Williamson"), to artificially inflate the value of the OGR Fund during a marketing initiative from October 2009 through 2010 (the "Marketing Period").  Specifically, the OGR Fund's

Portfolio Manager disseminated marketing materials to prospective investors and quarterly reports to existing investors which contained material misrepresentations and omissions concerning the OGR Fund's valuation policies and performance. As a result of these misstatements and omissions, potential investors in the OGR Fund were misled regarding the OGR Fund's net asset value ("NAV") and internal rate of return ("IRR")[1].

2.      When DOE became aware of this illegal conduct, he reported his concerns to his direct supervisor (Defendant Williamson) and other corporate officials, which resulted in his harassment, suspension and eventual termination. DOE also reported this illegal conduct to the SEC's Office of the Whistleblower and the Massachusetts Attorney General's Office ("Mass AG's Office"). Because DOE was harassed, suspended and terminated for his whistle-blowing activities which are otherwise protected under Section 806 of the Sarbanes Oxley Act of 2002 ("Sarbanes Oxley Act") (18 U.S.C. § 1514A), Defendants have violated the Dodd-Frank Act of 2010 ("Dodd-Frank Act") (15 U.S.C. § 78u-6(h)). Specifically, DOE suffered harassment and retaliation in the Summer of 2011 for exercising his legally protected rights to inform his supervisors about, and refusal to participate in, conduct that he reasonably believed violated laws and rules designed to protect investors from violations of the federal securities laws.

## JURISDICTION AND VENUE

3.      Jurisdiction in this Court over Plaintiff's claim is invoked pursuant to the Dodd-Frank Act, 15 U.S.C. § 78u-6 ("Dodd-Frank Act").

4.      This Court has federal subject matter jurisdiction pursuant to 25 U.S.C. § 1331.

---

[1] Net Asset Value is a fund's price per share or unit, calculated by dividing the total value of all securities in the portfolio, less any liabilities, by the number of fund shares outstanding. Internal Rate of Return is a measure of a fund or portfolio's performance and potential for future cash flows. An Internal Rate of Return of 0.00 is where the present value of future cash flows is equal to the cost of investment.

5.     Venue is proper within this District, pursuant to 28 U.S.C. 1391 (b)(2), in that "a substantial part of the events or omissions giving rise to the claim occurred" in this District.

6.     This Court has supplemental jurisdiction over DOE's state law claims pursuant to 28 U.S.C. § 1367.

## PARTIES

7.     Plaintiff was hired by Oppenheimer Asset Management, Inc. ("OAM") in December 2009 as a Private Equity Analyst on the OAM Private Equity Team ("Private Equity Team") and was promoted to Associate Director in April 2011.  Just following his promotion, in the Summer of 2011, DOE was harassed and terminated after complaining to his direct supervisor and other corporate officials regarding material misrepresentations and omissions in the OGR Fund's marketing materials and quarterly reports which materially inflated the Fund's value and performance.  DOE subsequently conveyed his concerns to both the SEC and the Mass AG's Office, providing material assistance to their investigations into the matter.   DOE continued to assist the SEC and Mass AG's Office throughout their investigation of OAM, its affiliate Oppenheimer Alternative Investment Management, LLC ("AIM") and Defendant Williamson.

8.     OAM is a New York corporation with its principal place of business in New York, New York.  OAM is a wholly-owned subsidiary of E.A. Viner International Co., which is a wholly-owned subsidiary of Oppenheimer Holdings, Inc., ("Oppenheimer") a publically held company listed on the New York Stock Exchange.  OAM is the OGR Fund's Sponsor and an SEC registered investment advisor.  DOE was initially hired by OAM.

9.     Defendant Oppenheimer & Co. Inc. ("OPCO") is a New York corporation with its principal place of business in New York, New York.  Upon information and belief, OPCO is a wholly-owned subsidiary of Oppenheimer.  OPCO served as the administrator for the OGR

Fund, is a broker dealer and an SEC registered investment advisor. OPCO issued DOE's paychecks and year-end W-2 tax forms.

10.     OAM and OPCO (collectively, the "Corporate Defendants") each had – and exercised – supervisory powers over DOE, including the power to suspend and terminate his employment. As such, both OAM and OPCO are considered "employers" pursuant to the applicable provisions of the Dodd-Frank Act

11.     Defendant Brian Williamson was at all relevant times an Executive Officer of OAM and the Portfolio Manager for the OGR Fund. Williamson was the individual directly responsible for the OGR Fund's management and marketing, and was DOE's direct supervisor. Defendant Williamson was the individual who initially devised and drafted the material misstatement and omissions in the OGR Fund documents and ultimately retaliated against DOE for reporting his concerns.

12.     John T. McGuire ("McGuire") was at all relevant times the Deputy General Counsel and Director of litigation at OPCO. McGuire failed to heed DOE's warnings regarding the OGR Fund, and ultimately retaliated against DOE for reporting his concerns. In fact, Defendant McGuire also accused DOE of illegal activity when it became clear that DOE would continue to raise his concerns regarding the material misstatements in the OGR Fund documents.

13.     Defendants Williamson and McGuire (collectively, the "Individual Defendants") each had – and exercised – supervisory powers over DOE, including the power to suspend and terminate his employment. As such, both Defendants Williamson and McGuire are considered "employers" under the applicable provisions of the Dodd-Frank Act.

### NON-PARTIES

14.     Cartesian Investor-A ("Cartesian") is a private equity fund sponsored by Cartesian Capital Group, LLC.  During the relevant period, Cartesian owned just one investment, shares in S.C. Fondul Proprietatea SAS ("Fondul").

15.     Fondul, at all relevant times, was a closed-end fund set up by the Romanian government to benefit citizens whose property was expropriated during Communist rule.

16.     OGR Fund is a Delaware limited partnership with its principal place of business located in New York, New York.  The OGR Fund is a fund of private equity funds with an emphasis on investments in companies with natural resources and energy related assets.

17.     Oppenheimer Alternative Investment Management, LLC ("AIM") is a Delaware limited liability company with its principal place of business located in New York, New York. AIM is the OGR Fund's General Partner, an affiliate of OAM and an SEC registered investment advisor.

18.     Oppenheimer is a Delaware corporation with its principal place of business located in New York, New York.  Oppenheimer is a publically traded investment bank and full-service investment firm which wholly-owns both OAM and OPCO, either directly or through its subsidiaries.  Its common stock trades on the New York Stock Exchange under the ticker symbol "OPY".

19.     Albert G. Lowenthal was at all relevant times the Chairman and Chief Executive Officer of Oppenheimer, OPCO and OAM.

### STATEMENT OF FACTS

**A.     Background**

20.     DOE applied for a position at OAM in the Fall of 2009.  Specifically, DOE applied for a position as a Private Equity Analyst focusing on energy and energy related

investments. After a series of interviews, DOE was hired by OAM in December 2009 and became a member of the OAM Private Equity Team ("Private Equity Team") headed by Brian Williamson. Defendant Williamson was DOE's direct supervisor at all relevant times during DOE's employment at OAM.

21.    By all objective criteria, DOE's performance at OAM was outstanding. In fact, in his first 12 months of employment, DOE was primarily responsible for sourcing the OAM's first direct[2] private equity offerings in the energy sector: Kansas Resource Exploration & Development (obtaining $30 million in capital commitments) and Triangle Petroleum (obtaining $25 million in capital commitments). In early 2011, DOE also developed the strategy and co-authored the private placement memorandum for the Private Equity Team's first fund focusing exclusively on direct private equity offerings in the energy sector – Oppenheimer Drilling Partners ("ODP"). DOE *personally* obtained millions in capital commitments for the ODP offering. In fact, ODP became the group's most profitable product shortly after its debut. These offerings – all sourced and developed by DOE – increased the value of OAM's oil and gas portfolios from $10-20 million to more than $80 million. Not surprisingly, DOE received glowing performance reviews throughout 2010 and a bonus in the first quarter of 2011 equal to 110% of his base salary.

22.    After little more than 12 months on the job, DOE was given an off-cycle promotion to Associate Director of the Private Equity Team in April 2011. Such a rapid ascent and off-cycle promotion were unusual at OAM, but Defendant Williamson confided to at least one member of the Private Equity Team that the promotion was necessary because it was

---

[2] Up until this point in time, all of OAM's investments in the energy sector had been through fund-of-fund offerings. However, direct offerings are generally more lucrative to investment firms like OAM because they generate greater management fees.

embarrassing to have a mere "Analyst" leading OAM's marketing, sourcing and due diligence efforts in the oil and gas sector.

**B.   The OGR Fund**

23.      Among the various funds managed by the Private Equity Team was the OGR Fund.  The OGR Fund's stated investment objective is "to provide income and long-term capital appreciation by investing in a diversified portfolio of select private equity and equity-related investments within developed and developing market countries managed by experienced teams capable of generating superior returns."

24.      The OGR Fund was established as a limited partnership in 2007, and OPCO began to raise initial capital in the OGR Fund in April 2008.  The OGR Fund offered accredited investors the opportunity to subscribe for limited partnership interests denominated in either Class A or Class B Units.  The OGR Fund's general partner, AIM, set the minimum investment for Class A Units at $500,000 and the minimum investment for Class B Units at $5,000,000. Between April 2008 and April 2010, the OGR Fund raised approximately $85 million and total current investment to the Fund is estimated at $140 million.

25.      The OGR Fund's audited financial statements show that as of December 31, 2008, 41.3% of the OGR Fund's capital was invested in the private equity fund Cartesian Investors-A, L.P.  The assets of Cartesian consisted solely of shares in Fondul.  Because such a high percentage of the OGR Fund's capital was committed to Cartesian, any untrue statements regarding Cartesian would have a massive and material effect on the OGR Fund's value and on potential investors' consideration of the Fund's profitability.

26.      Fondul shares have a nominal or "par value" of 1.0 Romanian Leu ("RON"), but these shares have always traded at a fraction of par value.  Indeed, throughout the Marketing

Period, Fondul shares never traded anywhere close to their par value of 1.00 RON as demonstrated by the below chart:[3]



27.    The OGR Fund's holdings in Cartesian/Fondul were initially valued based upon the underlying fund manager's estimated value, which was based upon the "at cost" valuation supplied by Fondul's Investment Manager, Pangaea One, L.P. ("Pangaea"). This valuation was consistent with the OGR Fund's clearly articulated policy in the Fund's marketing materials, which states: ***"the General Partner expects that in most cases it will value the Underlying Funds in accordance with the valuations reported to it by the Managers of the Underlying Funds,"*** and that ***"[a]s a fund of funds, we require our underlying fund managers to utilize third party valuation firms that provide valuations of the respective portfolios in accordance with FASB 157."[4]*** Specifically, FASB 157 states that a "quoted price in an active market provides the most reliable evidence of fair value and shall be used to measure fair value whenever available."

28.    Despite these clear representations, no later than October 29, 2009, the valuation methodology for the OGR Fund's holdings in Cartesian/Fondul was fraudulently changed in

---

[3] Unless otherwise stated, the trading values of Fondul cited herein are provided by Intercapital Invest, a Romanian-based financial investment services company which analyzed and tracked Fondul performance.

[4] Emphasis has been added throughout by Counsel.

order to facilitate the marketing of the Fund to new investors. This revised valuation methodology ("Revised Valuation Methodology"), which was not disclosed to investors, was implemented by Defendant Williamson, who ordered the Cartesian holdings be valued at Fondul's par value of 1.00 RON. At the time of Williamson's order, shares in Fondul were trading over-the-counter ("OTC") for less than 0.25 RON.

29.     The par value of an equity security is a static measure that does not fluctuate with the market. It does not go up or down and bears no relationship to the fair market value of a security. For example, Microsoft Corp. ("Microsoft") common stock, one of the most widely traded and held securities in the world, has a par value of $0.00000625 per share and a trading price on the NYSE (as of close of business February 4, 2014) of $36.35. If a private equity fund were to have one share of Microsoft stock as its only holding, the fund's net asset value on February 4, 2014, under FASB and any other reasonable valuation method would be $36.35. Under Defendant Williamson's Revised Valuation Methodology, however, a fund holding a single share of Microsoft would be deemed to have a NAV of only $0.00000625.

30.     This change in valuation methodology, and its huge impact on the reported performance of the OGR Fund, caused the stated return of the OGR Fund to be vastly overstated. For example, on October 7, 2009, immediately prior to the Marketing Period, Williamson distributed to *current* investors in the OGR Fund a Q2 2009 Quarterly Package (the "Q2 2009 Report"). This Pre-Marketing Period Report contained the following chart:

| Oppenheimer Global Resource Private Equity Fund June 30, 2009 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Fund Name | Commitment Date | Committed Capital | Contributed Capital | % Capital Contributed | Realized Proceeds | Net Asset Value* | Net Multiple | Net IRR (%) |
| Blue Tip Energy Partners Fund I, L.P. | Apr-08 | $ 7,000,000 | $ 2,433,032 | 34% | $ 10,513 | $ 2,114,146 | 0.9x | -13.1% |
| Cartesian Investors-A, L.P. | Jun-08 | $ 7,000,000 | $ 6,116,464 | 89% | $ 95,313 | $ 6,050,690 | 1.0x | -1.0% |
| Starwood Energy Infrastructure Fund I, L.P | May-08 | $ 7,000,000 | $ 1,050,000 | 15% | $ - | $ 950,947 | 0.9x | -18.3% |
| Tripod Capital China Fund II, L.P. | Oct-08 | $ 7,000,000 | $ 4,210,874 | 60% | $ - | $ 4,999,930 | 1.2x | 40.0% |
| **Total - Net to Fund** | | **$ 28,000,000** | **$ 13,860,370** | **50%** | **$ 105,926** | **$ 14,119,713** | **1.02x** | **3.8%** |
| | | | | | | **Net to Limited Partners** | **0.95x** | **-6.3%** |

* Net Asset Values are based on the underlying managers' estimated values as of June 30, 2009

31.    As this chart shows, **current** investors in the OGR Fund were informed on October 7, 2009 that the Cartesian fund showed an internal rate of return of -1% and a net asset value of $6,050,690 as of June 30, 2009.  This valuation reflected the Underlying Fund manager's at-cost valuation of the Fondul shares in accordance with FASB 157.  Using this valuation of Cartesian, and through it Fondul, the OGR Fund displayed a net loss to investors of -6.3%.  The Q2 2009 Report stated that NAVs "are based on the underlying managers estimated values as of June 30, 2009."

32.    Shortly after the release of the Q2 2009 Report, and without informing investors, Defendant Williamson fraudulently changed the valuation methodology for the Cartesian holdings in order to facilitate its marketing initiative to **prospective** investors.  Defendant Williamson did this by valuing the Cartesian holdings at their par value of 1.00 RON, while Fondul shares were being valued at cost by the fund's manager and trading over-the-counter for less than 0.25 RON.  Indeed, in a PowerPoint presentation distributed to **potential** investors in

late October 2010, the OGR Fund reported robust performance of the Fund's Cartesian assets for the same period – *i.e.,* Q2 2009:

### Oppenheimer Global Resource Private Equity Fund
### June 30, 2009

| Fund Name | Commitment Date | Committed Capital | Contributed Capital | % Capital Contributed | Realized Proceeds | Net Asset Value¹ | Multiple | IRR (%) |
|---|---|---|---|---|---|---|---|---|
| Blue Tip Energy Partners Fund I, L.P. | Apr-08 | $ 7,000,000 | $ 2,403,032 | 34% | $ 10,613 | $ 2,118,148 | 0.9x | -13.1% |
| Cartesian Investors-A, L.P. | Jun-08 | $ 7,000,000 | $ 6,196,464 | 89% | $ 95,313 | $ 9,272,956 | 1.5x | 67.0% |
| Starwood Energy Infrastructure Fund I, L.P. | May-08 | $ 7,000,000 | $ 1,050,000 | 15% | $ - | $ 950,947 | 0.9x | -18.0% |
| Tripod Capital China Fund II, L.P. | Oct-08 | $ 7,000,000 | $ 4,210,874 | 60% | $ - | $ 4,999,930 | 1.2x | 40.0% |
| **Total** | | **$ 28,000,000** | **$ 13,860,370** | **50%** | **$ 105,926** | **$ 17,341,979** | **1.3x** | **38.3%** |

¹ Unrealized Values are based on the underlying managers' estimated values as of June 30, 2009.

33.    This chart is in nearly all ways identical to the chart featured in the Q2 2009 Report. It offers OGR Fund performance up to June 30, 2009. It contains identical values for Blue Tip Energy Partners Fund I, L.P., Starwood Energy Infrastructure Fund I, L.P., and Tripod Capital China Fund II, L.P. and contains a footnote stating that NAVs "are based on the underlying managers' estimated values as of June 30, 2009." However, one difference is immediately apparent*: Cartesian shows an IRR of positive 67 percent, rather than negative 1 percent and an asset value of $9.27 million instead of $6.05 million.* Using these numbers, the OGR Fund as a whole shows a ***positive*** IRR of 38.3 percent rather than a ***negative*** IRR of 6.3 percent. The valuations and IRRs all changed, despite the fact that this chart involved the same assets over the same time period and should have involved the same returns.

34.    Indeed, throughout the Marketing Period, Defendants solicited investments in the OGR Fund through materially untrue marketing materials that touted the Fund's strong financial

performance, NAV and IRR, without disclosing to investors that the valuation methodology used to arrive at those figures with regards to the Cartesian assets was materially different from the methodology it purported to be using in the Solicitation Documents.

### C.    DOE Internally Reports Concerns Over OGR Fund's Valuation

35.     After his promotion to Associate Director in 2011, DOE first noticed that the methodology for valuing the Cartesian assets in the OGR Fund was different than the stated valuation policies in Oppenheimer Annual Report.   DOE investigated this discrepancy and learned that Defendant Williamson changed the OGR Fund's valuation policy in October 2009 in order to inflate its purported valuation.

36.     Specifically, DOE discovered that before October 2009, the OGR Fund's assets were valued at market price or based upon the Fund manager's estimate of value, consistent with the stated policies of Oppenheimer, OPCO and OAM.   Subsequently, Williamson began valuing the Fund's holdings in Fondul at their "par value" of 1.00 RON, while these same Fondul shares were valued at their much-lower cost by the fund's manager and were trading OTC as low as 0.25 RON at the same time.

37.     DOE also observed that the marketing materials for the OGR Fund stated that the underlying funds would be valued in accordance with either the valuations reported to it by fund managers or the trading price on an active market.   At that time, none of the OGR Fund's marketing materials said that underlying funds would be valued at par value – which is an arbitrarily assigned number with no relation to actual value.

38.     DOE voiced his objections to these deceptive valuation practices internally – including by email to Vineet Bhalla, Chief Financial Officer of OAM.   Specifically, on or around April 2011, DOE advised Mr. Bhalla that the OGR Fund needed to use a different valuation

approach in order to adhere to the Fund's stated valuation methodology in the marketing materials. Mr. Bhalla ignored DOE's warning and refused to respond to DOE's email.

39.     DOE also brought his concerns regarding these deceptive valuation practices to his immediate supervisor, Defendant Brian Williamson, and others in the Private Equity group. DOE also suggested that the accounting firm Deloitte Touche Tohmatsu Limited be brought in to audit the OGR Fund's financials, but his concerns continued to go unaddressed.   Shortly thereafter, Defendant Williamson placed a job posting seeking applicants for DOE's position on the internet.

40.     On May 31, 2011, Williamson called DOE into his office and informed him that he was being terminated for forgery of his expense reports – a ludicrous and provably false allegation.  Williamson claimed that DOE had forged Williamson's digital signature on certain reports. This was clearly a pretext for DOE's dismissal.  In fact, DOE had explicitly asked Defendant Williamson for his permission to use his digital signature to submit expense reports, because Williamson's extensive travel schedule made it difficult to coordinate on these types of administrative tasks.  In fact, DOE later produced to Defendant McGuire and others an email confirming that his use of Williamson's digital signature had been authorized and all expenses reported by DOE were paid in the normal course of business.

41.     Defendant McGuire contacted DOE on June 1, 2011 after DOE emailed OAM's President, Tom Robinson, about his retaliatory termination.  In that call, McGuire told DOE that he believed DOE had been suspended – not terminated – and that one reason for this suspension was that DOE had, without authorization, signed certain paperwork necessary for an investment in Triangle Petroleum.  In fact, however, Defendant Williamson had specifically authorized DOE to sign such paperwork and DOE had done so in the past without any objections from

Williamson. Thereafter, Williamson would authorize the wire transfer for this investment and the transaction was completed without incident.

42.    A few days later, DOE provided McGuire with additional information about the overvaluation of Fondul assets, by phone and email. However, DOE's concerns fell upon deaf ears. In fact, during these communications, Defendant McGuire rejected DOE's allegations out of hand and falsely accused DOE of having reached out to OAM and OPCO investors in order to steal business from his employers and violating Oppenheimer's insider trading restrictions. Based upon this pretext. McGuire strongly advised DOE to resign, in order to save DOE the stigma of being fired for cause.

43.    Undeterred, DOE subsequently warned OPCO Chairman Albert ("Bud") Lowenthal about the overvaluation of Fondul in an email dated June 24, 2011. The email, with the subject line "OGR PE Fund Valuation Practice Concerns," states, in part, as follows:

> Mr. Lowenthal:
>
> I decided to reach out to you directly as I have received no response, written notification of my status, or any feedback related to the purported investigation that was apparently conducted by Mr. McGuire following my abrupt, groundless and seemingly retaliatory suspension/dismissal from Oppenheimer on May 31, 2011.
>
> *I now believe it personally prudent to make you and the compliance officer of the Board aware of the details of the very sensitive information I repeatedly conveyed to my supervisor, Brian Williamson, Managing Director, though to little avail.* Additionally, I believe the following matters, as well as witnessed conversations where I expressed my concerns about the proposed joint spin-out with Tyler Dritz and Ben Posen, to be the real basis for his actions against my employment and not the groundless and contradictory rationale given. I do not deserve the tarnish this arbitrary and capricious action will undoubtedly cause to my reputation and career, if not satisfactorily reconciled.
>
> *I made multiple internal attempts to encourage a remedy of this situation by requesting an independent audit, accurate restatement and/or notification of institutional investors, consultants and brokers who relied on the misstated valuation OPCO provided for their investment decisions.* Knowing most of these brokers and institutional investors personally, if they were to learn that this

information was known and not properly disclosed, I am certain their confidence in Oppenheimer would diminish substantially, to say the least.

In the Notes to Consolidated Financial Statements in the OPPENHEIMER HOLDINGS, INC. 2010 Annual Report, it states, "In its role as general partner in certain hedge funds and private equity funds, the Company, through its subsidiaries, holds direct investments in such funds. The Company uses the net asset value of the underlying fund as a basis for estimating the fair value of its investment."

In June 2008, Oppenheimer Global Resource Private Equity Fund, L.P. ("OGR") invested in shares of Fondul Proprietatea ("Fondul"), an investment fund set up by the Romanian Government to compensate persons whose properties were abusively seized by the prior communist regime. OGR made a $7 million investment in Fondul through a fund called Cartesian Investors-A, L.P. ("Cartesian"). Through the investment in Cartesian, OGR received 27.68 million Fondul shares. Prior to Fondul's 2010 listing on the Bucharest Stock Exchange (BSE), the shares were traded OTC.

Prior to Q3 2009, OGR's investment in Cartesian had been held at a value consistent with OGR's valuation footnote on its financial statements, which states "Net Asset Values are based on the underlying managers' estimated values" and Oppenheimer Holdings' stated private equity valuation policy, which states "The Company uses the net asset value of the underlying fund as a basis for estimating the fair value of its investment." Prior to Q3 2009, Cartesian, and therefore OGR, held the investment at cost.

For the Q3 2009 OGR financial statements and quarterly report, Oppenheimer applied a new valuation methodology for its investment in Cartesian. This methodology applied the number of Fondul shares held through Cartesian multiplied by the par value of the shares (RON 1.00 each). *This resulted in a 60% markup in the stated value of the investment to 1.6x the initial cost.* . . . For the same period ended 9/30/2009, Cartesian held the investment at cost . . . . OGR's valuation footnote on its 9/30/2009 financial statements remained "Net Asset Values are based on the underlying managers' estimated values." *However, this was not the case. OGR held the investment at 1.6x cost, while the underlying manager, Cartesian, held the same investment at cost.*

For Q3 2009, OGR valued its investment in the Cartesian fund approximately 60% above Cartesian's holding value.

Note that, as of 9/30/2009, Cartesian was OGR's largest investment and represented over 35% of the fund's invested capital. *Without any doubt, marking up an investment which represents over 35% of the fund's invested capital by approximately 60% had a material impact on the stated performance of the OGR fund.* For the Q4 2009 OGR financial statements and quarterly report, Oppenheimer continued to apply the same valuation methodology multiplying the

15

number of Fondul shares held through Cartesian by the par value of the shares (RON 1.00). The resulting value of the Cartesian investment in Q4 2009 was 1.5x cost (varying only slightly from the Q3 2009 valuation due to exchange rate fluctuations between the USD and RON. . . . Note that the Cartesian Q4 2009 financial statements assigned a value of ~1.2x cost for its investment in Fondul shares. . . . Again, OGR's valuation footnote on its 12/31/2009 financial statements remained "Net Asset Values are based on the underlying managers' estimated values." *However, this was not the case. OGR held the investment at 1.5x cost, while the underlying manager, Cartesian, held the same investment at ~1.2x cost.* As a result, the OGR fund's share of Cartesian's total US GAAP (Fair Value) NAV of $15,769,427 . . . (Provided by Cartesian) did not reconcile with the stated NAV in OGR's year-end report. . . .

Further, according to . . . [an] Intercapital Invest research report Fondul's "Current OTC Trading Price" was RON 0.2500. Additionally, Intercapital Invest's "Target Price" for Fondul was RON 0.7132. OGR's RON 1.00 per share valuation was well in excess of both the OTC trading price and the research report's target price. . . .

Mr. Williamson's justification for the use of the RON 1.00 par value for Fondul shares was noted in the attached year end Cartesian Valuation Memo dated May 19, 2010. . . . The Fondul valuation methodology used was not in any way based on Cartesian's estimated value (as the year-end OGR footnote states it was). In fact, the Intercapital Invest research report's RON 0.7132 "Target Price" was even cited as the "Fair Market Value" of the Fondul shares within the memo.

Mr. Williamson ultimately decided to use what he referred to as the "Face Value" of RON 1.00 in order to support a valuation that is approximately 40% greater than what he personally defined as the "Fair Market Value" within the memo.

The memo also illustrates that using Intercapital Invest's "Target Price" (or what Mr. Williamson referred to as the "Fair Market Value") of RON 0.7132 would result in a value of 1.1x cost for the overall Cartesian investment. Additionally, the memo did not even mention Fondul's "Current OTC Trading Price" of RON 0.25. Use of the observable "Current OTC Trading Price" (which would represent a level 1 or 2 measurement in Oppenheimer's stated valuation hierarchy) would have resulted in a year-end valuation of 0.4x cost for the overall investment, representing an approximate 60% loss for the Cartesian investment.

*For Q4 2009, OGR valued its investment in the Cartesian fund approximately 25% above Cartesian's stated holding value and approximately 300% above the OTC trading price of the underlying Fondul shares.*

*In 2010, weeks before the Q1 2010 quarterly report was released, OGR increased its holdings in Cartesian, adding another approximately 15.8 million Fondul shares at a cost of approximately RON 0.50 per share. This increased*

*the total cost basis of the Cartesian investment by approximately $2.6 million. On the Q1 2010 quarterly report, that new block of Fondul shares increased the Cartesian valuation by approximately $5.2 million. To clarify, weeks prior to the Q1 2010 quarterly reporting date, OGR acquired 15.8 million additional Fondul shares for approximately $2.6 million (or approximately RON 0.50 per share) and immediately marked them up to $5.2 million (or RON 1.00 per share) for reporting purposes. On the OGR quarterly report, the new incremental block of shares generated a greater than 100% return in a matter of weeks, while the OTC trading price did not reflect any such appreciation in value.* Still Mr. Williamson relied on the attached Cartesian Valuation Memo to justify his decision to mark the entire Cartesian investment up to 1.7x cost for Q1 2010. . . .

These inflated values were highlighted in the fund's performance and regularly used to attract new investors into the fund. OGR [r]aised over $61 million in closings that occurred on or after 9/30/2009 from sixty investors, including wealthy individuals, Oppenheimer brokers, university endowments and public pension funds. One of the key considerations these investors analyzed prior to making an investment in OGR was the fund's performance to date. Though I was uninvolved with the selling of OGR, I would surmise these investors were buying into the fund with what they believed were "embedded gains". However, utilizing the Cartesian's "at cost" 9/30/2009 valuation or Fondul's OTC trading price of RON 0.25, they were really investing in a fund with "embedded losses".

Fondul is currently trading on the highly liquid Bucharest Stock Exchange; its trading value has appreciated substantially since Q3 2009. As of yesterday's close, the shares are trading at RON 0.52 (approximately half of the RON 1.00 par value that Mr. Williamson has used since Q3 2009). Despite the recent rise in trading value associated with Fondul's BSE listing, the overall investment is down approximately 10% to date.

I have shared this information in redacted form and in strict confidence with a past Chairman of an authoritative accounting standards board. Based on the fully redacted information I provided to him, he likewise concluded that there appeared to be wrongdoing. He expressed concern for my situation and dismay that a publicly traded company had handled this matter in this way. He has recommended that I resign from my position, retain an attorney and submit this evidence to the SEC.

Prior to my separation, I was proud and grateful to be on the Oppenheimer team. As you may be aware, I received multiple glowing performance reviews, rapid promotions and significant bonuses immediately prior to my abrupt departure. I was also able to defend and completely dispel with incontrovertible evidence the false, contrived accusations of any wrongdoing on my part. For that reason, I am appealing to you personally to initiate and arrive at an ethical and mutually satisfactory resolution.

44.    Later that day, Steven Beach, Chief Compliance Officer of OAM responded to DOE's email to Mr. Lowenthal. Mr. Beach advised DOE that he was in fact on suspended status (although previously, he was told he was being terminated by Williamson). A few days later, DOE met with Defendant McGuire and other OPCO executives. The meeting lasted for approximately 3 hours. At the meeting, DOE was advised that the group believed his allegations, but that reinstatement would hinge upon DOE's ability to prove that he executed the Triangle Petroleum documents with Williamson's knowledge and/or approval. DOE later forwarded McGuire an email proving Williamson granted him such permission.

45.    In subsequent communications, McGuire offered to have DOE return to Oppenheimer in a different position. The position offered to DOE, however, was not an offer of reinstatement as it amounted to a back office position entirely unrelated to his experience, skills and career track. When DOE did not accept this inadequate position, McGuire terminated his employment.

46.    After DOE's termination, he engaged a New York City law firm, who communicated with McGuire regarding DOE's unlawful termination. During these communications, McGuire again denied any wrongdoing related to the OGR Fund's obviously fraudulent valuation practices, and stated that DOE's warnings were misguided and unwarranted. As McGuire wrote on October 27, 2011:

> The overarching misconception on [DOE's] part has been that somehow the purported overvaluation of Fondul was deliberate and fraudulent, and designed to entice potential investors to become limited partners of OGR PE. Despite the recitation in [prior counsel's] letter of [DOE's] sophistication, experience, training, and abilities, it seems that he has chosen to ignore a rudimentary fact: limited partners in private equity funds become limited partners knowing full well that they are anticipating a 10-year investment horizon, with no opportunity for liquidity until maturity of the fund.

47.     Moreover, in the same correspondence, McGuire accused DOE of "*personal animus*" in making unfounded claims regarding the valuation of the Fondul assets:

> One might conclude, after reviewing [DOE's] "apples v. oranges" approach in criticizing the valuation of OGR PE's Fondul investments, that your client may have been motivated by his dissatisfaction with his lack of a role or participation in Mr. Williamson's anticipated new venture, as well as by whatever personal <u>animus</u> he bears towards his former supervisor. What is clear is that his claims regarding inaccurate valuation and retaliation are wholly without merit.

**D.     DOE Reports His Concerns to the SEC and Mass AG's Office**

48.     Having exhausted his efforts to convince his superiors to rectify the OGR Fund's valuation practices, DOE brought his concerns directly to the U.S. Securities and Exchange Commission ("SEC" or "Commission") through the Commission's online Tip, Complaint or Referral ("TCR") Portal and filed a TCR Form with the Office of the Whistleblower.

49.     Subsequent to the filing of the TCR Form, and based on DOE's allegations, the SEC began a formal investigation of the OGR Fund's practices and methodologies for valuing its underlying assets. DOE cooperated with the Commission's investigation and provided extensive and timely assistance, helping the SEC establish the facts set forth herein.

50.     In addition, DOE contacted the Mass. AG's Office regarding the OGR Fund. DOE felt that his information regarding the OGR Fund was relevant to the Mass. AG's Office because two Massachusetts public pension funds (who acted as Co-Lead Plaintiffs in a related securities class action) had invested in the OGR Fund following the change in valuation methodology. DOE cooperated with the Mass AG's Office subsequent investigation of the OGR Fund and provided material assistance in the form of both testimony and documents.

**E.     Settlements with the SEC and the Mass AG'S Office**

51.     DOE's concerns regarding the valuation practices for the OGR Fund have been vindicated by the Commission's and the Mass AG's Office successful investigations into the

matter.  In fact, on or about March 11, 2013, OAM and AIM consented to the entry of an Order

(the "Order") Instituting Administrative and Cease-and Desist Proceedings Pursuant to Section

8A of the Securities Act of 1933 and Sections 203(e) and 203(k) of the Investment Advisors Act

of 1940, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order

(Administrative Proceeding File No. 3-15238).

      52.     Under the terms of the Order, OAM and AIM agreed to distribute a total of

$2,269,098 (consisting of $1,868,463 from the SEC proceeding and $400,635 from the related

Mass. AG's proceeding) to a disgorgement fund to be used to compensate OGR investors who

invested in the OGR Fund from October 2009 through June 2010.  The disgorgement fund

represents the management fees collected by OAM from October 2009 through September 2012.

In addition, OAM and AIM agreed to pay civil monetary penalties of over $600,000.

      53.     Notably, the Commission's findings in the Order closely mirror DOE's warnings

to his employers regarding the valuation of Fondul assets in the OGR Fund.  For example, the

Commission found:

    a.     "The [marketing material] that was approved by compliance on October 22, 2009
          stated that the OGR's asset values were 'based on the underlying managers'
          estimated values.'" Order, ¶ 14.

    b.     "Rather than relying on Cartesian's valuation methodology, the Portfolio Manager
          [Defendant Williamson] valued OGR's investment in Cartesian at 'par value' –
          that is, the price at which the Romanian government issued shares to claimants.
          Use of the par value of Fondul to value OGR's investments in Cartesian resulted
          in a material increase in the value of OGR's Cartesian investment and, because it
          was OGR's largest holding, in OGR's performance." *Id.*, ¶15.

    c.     "During their marketing efforts, the Portfolio Manager and others in his group
          touted the performance of Cartesian and OGR to prospective investors, pointing
          to OGR's high IRR.  No one told investors and prospective investors that the
          reported increase in OGR's performance was a result of the Portfolio Manager's
          change in valuation method and that, if OGR had used Cartesian Capital's value,
          as OGR had done in the past and as was stated in the quarterly statements and
          pitch books, the performance numbers would have been materially lower." *Id.*, ¶
          22.

d.    "As a result of the conduct described above, Respondents willfully violated Section 17(a)(2) of the Securities Act, which prohibits any person in the offer or sale of securities from obtaining money or property by means of any untrue statement of material fact . . . ."  *Id.*, ¶ 25.

54.    Moreover, the SEC also charged Defendant Williamson with violations of the federal securities laws by, among other things, misleading investors about the valuation and performance of the OGR Fund and its holdings in Fondul.  As the Commission stated in its August 20, 2013 press release:

> ***An SEC investigation found that Brian Williamson disseminated quarterly reports and marketing materials to prospective investors misstating that the valuation of the [OGR] fund's holdings was based on values received from the portfolio managers of those underlying funds. Williamson actually valued the fund's largest investment [Cartesian/Fondul] at a significant markup to the manager's estimated value. He also sent marketing materials reporting an internal rate of return that failed to deduct fees and expenses. As a result, the [OGR] fund's reported performance as measured by its internal rate of return – a key indicator of the fund's performance – was significantly enhanced....***
>
> "Investors deserve and the law requires honest disclosure about how their investments are valued," said Andrew J. Ceresney, Co-Director of the SEC's Division of Enforcement. ***"Williamson improperly lured investors to the private equity fund he managed by providing false and misleading information about the [OGR] fund's performance."***

55.    The SEC's allegations against Defendant Williamson were both detailed and damning, identifying multiple, specific instances in which he personally sent, or directed subordinates to send, marketing materials containing false statements regarding the value and internal rate of return of the OGR Fund and its underlying assets.  Moreover, the materiality of these false statements is beyond question, as laid out by the SEC in the following chart:

| IRR of OGR Cartesian Investment | | | Total OGR IRR | | |
|---|---|---|---|---|---|
| | OGR-Reported Cartesian IRR | Cartesian IRR Using Cartesian Valuation | | OGR-Reported Total IRR | OGR IRR Using Cartesian Valuation |
| 2Q2009 | 67.0% | -1.0% | | 38.3% | 3.8% |
| 3Q2009 | 53.5% | 1.5% | | 31.8% | 5.7% |
| 4Q2009 | 37.8% | 14.6% | | 21.0% | 9.8% |

56.    On January 22, 2014, the Commission announced that it had reached a settlement with Defendant Williamson in which *he agreed* to be permanently barred from the securities industry and pay a $100,000 penalty for making misrepresentations about the valuation of the OGR Fund.  The SEC's order against Williamson specifically found that he willfully violated Section 17(a) of the Securities Act of 1933, Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, and Section 206(4) of the Investment Advisers Act of 1940 and Rule 206(4)-8.

57.    As demonstrated by the above, DOE's warnings to his employers regarding the valuation of OGR Fund assets were clearly true and made in good faith, and his suspension, harassment termination and/or reassignment were unlawful retaliation for his attempt to stop illegal activity with regards to OGR Fund.

### FIRST CAUSE OF ACTION
### Violations of the Dodd-Frank Whistleblower Statute
### (Against all Defendants)

58.    Plaintiff repeats and realleges the allegations in paragraphs 1 to 57 as if fully set forth herein.

59.    OAM and OPCO are wholly-owned subsidiaries of Oppenheimer, which is a publically traded company having SEC reporting obligations.

22

60.     As detailed above, DOE reported his concerns about the OGR Fund and violations of the federal securities laws to his employers with the expectation that his concerns would be addressed and that any misconduct would be reported to the SEC.

61.     Instead, DOE was unlawfully discharged in retaliation for his reporting of these securities law violations.  DOE then filed a complaint with the SEC Office of the Whistleblower and contacted the Mass AG's Office regarding his concerns over the OGR Fund's valuation policies.

62.     Section 922 of the Dodd-Frank Act, 15 U.S.C. § 78u-6 states that no employer may discharge a whistleblower because of any lawful act done by the whistleblower in providing information to the SEC regarding potential violations of the federal securities laws *or* in making disclosures that are required or protected under the Sarbanes-Oxley Act, the Securities Exchange Act of 1934 (15 U.S.C. 78a *et seq.*), or any other law, rule or regulation subject to the jurisdiction of the Commission.

63.     DOE's internal reports regarding the inappropriate valuation of the OGR Fund's assets were protected by Section 806 of the Sarbanes-Oxley Act, 18 USC § 1514A and his termination based upon these internal reports violates the Dodd-Frank Whistleblower Statute, 15 U.S.C. § 78u-6.

64.     As a direct result of Defendants' violations of the Dodd-Frank whistleblower statute, DOE has been injured in an amount to be determined at trial.

### SECOND CAUSE OF ACTION
### Breach of Contract
### (Against Corporate Defendants)

65.     Plaintiff repeats and realleges the allegations in paragraphs 1 to 64 as if fully set forth herein.

66.     As described above, DOE entered into a valid and binding employment contract with the Corporate Defendants, which included promises of deferred compensation tied directly to performance

67.     As a result of the actions set forth herein, the Corporate Defendants have breached their employment contract with DOE by harassing, suspending and terminating him for refusing to engage in and/or conceal illegal behavior by his supervisor and others at OAM and OPCO.

68.     The Corporate Defendants have also breached their employment contract with DOE by refusing to pay monies due under their agreement related to deferred compensation in the form of *prorated* performance bonuses.

69.     As a direct result of Defendants' actions, DOE has suffered damages, including consequential damages, in an amount to be determined at trial.

**THIRD CAUSE OF ACTION**
**Breach of Covenant of Good Faith and Fair Dealing**
**(Against Corporate Defendants)**

70.     Plaintiff repeats and realleges the allegations in paragraphs 1 to 69 as if fully set forth herein.

71.     It is presumed that parties to contracts undertake their respective obligations in good faith, with intent to deal fairly.  In light of the Corporate Defendants obvious and blatant bad faith and wrongdoing, the Corporate Defendant have breached their duties of good faith and fair dealing.

72.     Due to the bad faith conduct of the Corporate Defendants, punitive damages should be assessed so that they are deterred from attempting such harmful employment practices in the future.

73.     As a direct result of the Corporate Defendants' actions, DOE has suffered damages, including consequential damages, in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### Tortious Interference with Contract
### (Against Individual Defendants)

74.     Plaintiff repeats and realleges the allegations in paragraphs 1 to 73 as if fully set forth herein.

75.     The Individual Defendants knew that a valid and binding employment contract existed between DOE and the Corporate Defendants.

76.     The Individual Defendants intentionally and with malice towards DOE interfered with this contract by harassing, suspending and terminating DOE for refusing to engage in and/or conceal illegal behavior by his immediate supervisor and others at OAM and OPCO.

77.     As a direct result of the Individual Defendants' actions, DOE has suffered damages, including punitive damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### Prima Facie Tort
### (Against All Defendants)

78.     Plaintiff repeats and realleges the allegations in paragraphs 1 to 77 as if fully set forth herein.  DOE does not assert a claim of prima facie tort on the basis of his termination.

79.     Defendants have intentionally inflicted harm upon DOE without excuse or justification solely by reason of Defendants' malevolence toward him, insofar as Defendants have harassed and suspended DOE without lawful basis and have caused DOE to be denied a bonus payment to which he was entitled by virtue of work already performed.

80.     As a direct result of the Defendants' actions, DOE has suffered damages, and is entitled to consequential and punitive damages, in an amount to be determined at trial. Among other damages, DOE has suffered particularized damages in an amount to be determined through discovery, which is the estimated amount of the bonus that DOE earned prior to being terminated.

## ATTORNEY'S FEES AND COSTS

81.     Plaintiff's attorneys' fees and costs are compensable in this matter pursuant to the Dodd-Frank Act.  In addition, an award of attorney's fees and costs are particularly warranted in this matter, as DOE has repeatedly and in good faith attempted to negotiate a reasonable resolution of this dispute without having to refer the matter to this forum for adjudication.  None of DOES's efforts resulted in a single settlement offer from Defendants.

## PRAYER FOR RELIEF

**WHEREFORE** Plaintiff seeks judgment in his favor and against Defendants, as follows:

A.     Reinstating Plaintiff to his position at OAM with the same seniority status that he would have had but for the discrimination and retaliation;

B.     Awarding Plaintiff two times the amount of back pay he is owed, with interest;

C.     Awarding Plaintiff the deferred compensation he was due pursuant to his employment contract with reasonable interest;

D.     Compensating Plaintiff for litigation costs, including expert witness fees and reasonable attorney fees;

E.     Finding that Defendants committed intentional torts against Plaintiff and granting Plaintiff a punitive damages award; and

F.     Granting such other and further relief as the Court deems appropriate.

26

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands

a trial by jury in this action of all issues so triable.

Dated: February 6, 2014

Respectfully submitted,

By: _____
     Gregory M. Nespole
     Benjamin Y. Kaufman
     Daniel Tepper
     **WOLF HALDENSTEIN ADLER**
        **FREEMAN & HERZ LLP**
     270 Madison Avenue
     New York, NY 10016
     Tel:  (212) 545-4600
     Fax: (212) 545-4653
     nespole@whafh.com
     kaufman@whafh.com
     tepper@whafh.com

     **BLOCK & LEVITON LLP**
     Jason M. Leviton
     Mark A. Delaney
     Joel A. Fleming
     155 Federal Street, Suite 1303
     Boston, MA 02110
     Telephone: (617) 398-5600
     Facsimile:  (617) 507-6020
     Jason@blockesq.com
     Mark@blockesq.com
     Joel@blockesq.com

     *Attorneys for Plaintiff John Doe*

739700