**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOHN DOE,<br><br>                      Plaintiff,<br><br>        vs.<br><br>OPPENHEIMER ASSET MANAGEMENT,<br>INC., OPPENHEIMER & CO., INC., BRIAN<br>WILLIAMSON and JOHN T. MCGUIRE,<br><br>                      Defendants. | Case Number:<br>1:14-cv-00779-HB<br><br>**ORAL ARGUMENT**<br>**REQUESTED** |

**PLAINTIFF'S MEMORANDUM OF LAW**
<u>**IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**</u>

**WOLF HALDENSTEIN ADLER**
**FREEMAN & HERZ LLP**
Gregory M. Nespole
Benjamin Y. Kaufman
Daniel Tepper
270 Madison Avenue
New York NY 10016
Tel:  (212) 545-4600
Fax:  (212) 545-4653
Nespole@whafh.com
Kaufman@whafh.com
Tepper@whafh.com

*Counsel for Plaintiff John Doe*

**BLOCK & LEVITON LLP**
Jeff Block
Jason M. Leviton
Mark A. Delaney
Joel A. Fleming
155 Federal Street, Suite 1303
Boston, MA 02110
Tel: (617) 398-5600
Fax: (617) 507-6020
Jason@blockesq.com
Mark@blockesq.com
Joel@blockesq.com

*Counsel for Plaintiff John Doe*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................ii

I.  PRELIMINARY STATEMENT ............................................................... 1

II.  STATEMENT OF FACTS .................................................................... 3

III.  ARGUEMENT ...................................................................................... 10

    A.  Plaintiff Satisfies The Definition Of "Whistleblower" In the DFA And Is Entitled To The Anti-Retaliation Protection Afforded Therein ........................ 10

    B.  The Individual Defendants Are "Employers" Under The Applicable Provisions Of The DFA.............................................................................. 15

        1.  SOX Is Interpreted Such That The Term "Employer" Includes Individuals And DFA Should Be Similarly Interpreted .................................................... 15

        2.  The Second Circuit Interprets The Fair Labor Standards Act's Undefined Term "Employer" To Include Individuals ...................................................... 17

        3.  Legislative History And Broader Policy Considerations Support An Interpretation Of "Employer" That Will Deter Individual Wrongdoing ........ 18

    C.  The Corporate Defendants Breached Their Employment Contract With Plaintiff, Including The Implied Covenant Of Good Faith And Fair Dealing.................. 20

    D.  Plaintiff Is Entitled To Plead Tortious Interference As An Alternative Claim .. 22

    E.  Plaintiff Is Entitled To Plead Prima Facie Tort As An Alternative Claim......... 24

IV.  CONCLUSION ...................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Ahmad v. Morgan Stanley & Co.*,
  13-cv-6394, 2014 U.S. Dist. LEXIS 23543 (S.D.N.Y. Feb 21, 2014) ........................ 12

*Asadi v. GE Energy (USA), LLC*,
  720 F.3d 620 (5th Cir. 2013) ............................................................................. 12-14

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................................. 10

*Ashmore v. CGI Group, Inc.*,
  11-cv-8611, 2012 U.S. Dist. LEXIS 82598 (S.D.N.Y. June 12, 2012) ...................... 21

*Backus v. Planned Parenthood*,
  161 A.D.2d 1116 (1st Dep't 2007) ........................................................................ 25

*Banko v. Apple Inc.*,
  No. CV 13-02977 RS, 2013 WL 7394596 (N.D. Cal. Sept. 27, 2013) ...................... 12

*Bear Stearns Funding, Inc. v. Interface Group-Nevada, Inc.*,
  361 F. Supp. 2d 283 (S.D.N.Y. 2005) .................................................................... 25

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................................. 10

*Burger v. Litton Indus*,
  91-cv-0918, 1996 U.S. Dist. LEXIS 5560 (S.D.N.Y. Apr. 24, 1996) ........................ 25

*Bussing v. Cor Clearing, LLC*,
  8:12-cv-238, 2014 U.S. Dist. LEXIS 69461 (D. Neb. May 21, 2014) ...................... 13

*Chevron U.S.A. v. Natural Resources Defense Council*,
  467 U.S. 837 (1984) ....................................................................................... 14, 15

*Cohen v. JP Morgan Chase & Co.*,
  498 F.3d 111 (2d Cir. 2007) .................................................................................. 15

*Coppola v. Proulx*,
  11-cv-00074, 2012 U.S. Dist. LEXIS 104792 (D. Nev. July 26, 2012) ...................... 10

*Corley v. United States*,
  556 U.S. 303 (2009) ............................................................................................. 14

*Cruz v. HSBC Bank, USA, NA*,
    12-cv-6088, 2014 U.S. Dist. LEXIS 32042 (E.D.N.Y. Mar. 10, 2014) ......................20

*Culver v. Merrill Lynch & Co.*,
    94-cv-8124, 1995 U.S. Dist. LEXIS 10017 (S.D.N.Y. July 17, 1995) .......................21

*Darnell v. Ford*,
    903 F.2d 556 (8th Cir. 1990)..........................................................................................19

*Egan v. Tradingscreen, Inc.*,
    10-cv-8202, 2011 U.S. Dist. LEXIS 47713 (S.D.N.Y. May 4, 2011)...................12, 14

*Evans v. Excellus Health Plan, Inc.*,
    No. 11-cv-1248, 2012 WL 3229292 (N.D.N.Y. Aug. 6, 2012)...................................24

*Fishoff v. Coty Inc.*,
    634 F.3d 647 (2d Cir. 2011)..........................................................................................21

*Goldberg v. Four Seasons Nursing & Rehab. Ctr.*,
    45151/03, 2004 N.Y. Misc. LEXIS 2866, at *3 (N.Y. Sup. Ct. Dec. 30, 2004)..........22

*Herman v. RSR Sec. Services Ltd.*,
    172 F.3d 132 (2d Cir. 1999).........................................................................................17

*Hibbs v. Winn*,
    542 US. 88 (2004) .......................................................................................................14

*Hughes v. Std. Chtd. Bank PLC*,
    09-cv-4595, 2010 U.S. Dist. LEXIS 38871 (S.D.N.Y. Apr. 14, 2010).................24, 25

*Ingle v. Glamor Motor Sales, Inc.*,
    73 N.Y.2d 183 (1989)..................................................................................................22

*Irizarry v. Catsimatidis*,
    722 F. 3d 99 (2d Cir. 2013)..........................................................................................17

*Jain v. McGraw-Hill Cos.*,
    827 F. Supp. 2d 272 (S.D.N.Y. 2011) .........................................................................25

*Jones v. SouthPeak Interactive Corp.*,
    12-cv-443, 2013 U.S. Dist. LEXIS 37999 (E.D. Va. Mar. 19, 2013) .........................15

*Kramer v. Trans-lux Corp.*,
    11-cv-1424, 2012 U.S. Dist. LEXIS 136939 (D. Conn. Sept. 25, 2012) ..............12, 16

*Kregler v. City of New York,*
  08-cv-06893, 2013 U.S. Dist. LEXIS 176091 (S.D.N.Y. Dec. 09, 2013)....................20

*Lawson v. FMR LLC,*
  134 S. Ct. 1158 (2014).................................................................................................16

*Lobosco v. N.Y. Telephone Co./NYNEX,*
  96 N.Y.2d 312 (2001).................................................................................................20

*Maestas v. Segura,*
  416 F.3d 1182 (10th Cir. 2005)..................................................................................19

*McHenry v. Lawrence,*
  66 A.D.3d 650 (2d Dep't 2009) .................................................................................22

*Murphy v. Am. Home Prods. Corp.,*
  58 N.Y.2d 293 (1983).........................................................................................20, 22

*Murray v. UBS Secs., LLC,*
  12-cv-5914, 2013 U.S. Dist. LEXIS 71945 ...................................................12, 14-15

*Nelson v. Cap. Cardiology Assocs., P.C.,*
  97 A.D.3d 1072 (3d Dep't 2012) ...............................................................................23

*Pacquiao v. Mayweather,*
  803 F. Supp. 2d 1208 (D. Nev. 2011) ........................................................................25

*Philko Aviation, Inc. v. Shacket,*
  462 U.S. 406, 103 S. Ct. 2476, 76 L. Ed. 2d 678 (1983)...........................................13

*Phillips v. Vinson Supply Co.,*
  581 S.W.2d 789 (Tex. App. 1979) .............................................................................24

*Piquette v. City of New York,*
  4 AD 3d 402 (2nd Dep't. 2004) ..................................................................................24

*Professional Ass'n of Coll. Educators v. El Paso County Cmty. Coll. Dist.,*
  730 F.2d 258 (5th Cir.1984) ......................................................................................19

*Sabetay v. Sterling Drug, Inc.,*
  69 N.Y.2d 329 (1987).........................................................................................20, 22

*Saye v. St. Vrain Valley Sch. Dist. RE-1J,*
  785 F.2d 862 (10th Cir.1986).....................................................................................19

*SEC v. Citigroup Global Markets, Inc.*,
   No. 11-cv-5227, 2014 U.S. App. LEXIS 10516 (2d Cir. June 4, 2014) ...................... 15

*SEC v. National Securities, Inc.*,
   393 U.S. 453 (1969) .................................................................................................. 16

*Seiden Associates, Inc. v. ANC Holdings, Inc.*,
   754 F. Supp. 37 (S.D.N.Y. 1991) ............................................................................. 24

*Sher v. Allstate Ins. Co.*,
   947 F. Supp. 2d 370 (S.D.N.Y. 2013) ...................................................................... 10

*Siani v. State Univ. of N.Y. at Farmingdale*,
   2:09-cv-0407, 2014 BL 116994 (E.D.N.Y. Mar. 28, 2014) ....................................... 19

*Smith v. Bray*,
   681 F. 3d 888 (7th Cir. 2012) .................................................................................... 19

*Spiegel v. Schulmann*,
   604 F.3d 72 (2d Cir. 2010) ........................................................................................ 18

*Staub v. Proctor Hosp.*,
   131 S. Ct. 1186, 1190 n.1 (2011) .............................................................................. 19

*Strahan v. Kirkland*,
   287 F.3d 821 (9th Cir.2002) ...................................................................................... 19

*Swierkiewicz v. Sorema N.A.*,
   534 U.S. 506 (2002) .................................................................................................. 10

*Tejada-Batista v. Morales*,
   424 F.3d 97 (1st Cir. 2005) ....................................................................................... 19

*Tomka v. Seiler Corp.*,
   66 F. 3d 1295 (2d Cir. 1995) ..................................................................................... 18

*Wachovia Bank, NA v. Schmidt*,
   546 U.S. 303 (2006) .................................................................................................. 16

*Wakefield v. Northern Telecom, Inc*
   769 F. 2d 109 (2d Cir. 1985) ..................................................................................... 22

*Wieder v. Skala*,
   80 N.Y. 2d 628 (1992) .............................................................................................. 22

*Yang v. Navigators Group, Inc.*,
  13-cv-2073, 2014 U.S. Dist. LEXIS 63876 (S.D.N.Y. May 8, 2014)..........................11

**Statutes**

15 U.S.C §78u-6(h) ...............................................................................*passim*

18 U.S.C. §1514A(a)...........................................................................*passim*

**Rules**

Fed. R. Civ. P. 12(b)(6) .....................................................................1, 10

Fed. R. Civ. P. 8(d)...........................................................................3, 24

Fed. R. Civ. P. 9(b)................................................................................25

## I.     PRELIMINARY STATEMENT

Plaintiff John Doe ("Plaintiff" or "DOE")[1] submits this Memorandum of Law in opposition to the April 7, 2014 Joint Motion to Dismiss submitted by Oppenheimer Asset Management, Inc. ("OAM"), Oppenheimer & Co., Inc. ("OPCO" and with OAM, the "Corporate Defendants"), Brian Williamson ("Williamson") and John T. McGuire ("McGuire") (together with Williamson, the "Individual Defendants" and, collectively, with the Corporate Defendants, "Defendants") pursuant to Fed. R. Civ. P. 12(b)(6).

The Complaint alleges that Defendants retaliated against DOE when they, directly or indirectly, illegally harassed, threatened, suspended and ultimately fired him for exercising his legally protected rights to inform his supervisors about, and refuse to participate in, conduct that violated laws and rules designed to protect investors from fraudulent and deceptive practices in connection with the sale of limited partnership interests in the Oppenheimer Global Resource Private Equity Fund I, L.P. ("OGR Fund or "Fund"). Specifically, the Complaint alleges that the Defendants' actions against DOE were in violation of the Dodd-Frank Act of 2010 (15 U.S.C. § 78u-6(h)) ("DFA") and New York State common law.

Notably, DOE's concerns regarding Defendants' fraudulent and deceptive practices were proven meritorious and formed the basis for successful prosecutions by the U.S. Securities and Exchange Commission ("SEC") and the Massachusetts Attorney General's Office (Mass AG's Office"). Indeed, the SEC and the Mass AG's Office investigated DOE's concerns and collectively recovered more than $2.0 million for OGR investors, and the SEC barred Williamson from the securities industry for life. Just this week, the SEC awarded DOE (and a second whistleblower) the maximum award allowable for their reporting of the Defendants'

[1] The Complaint in this matter was filed under the fictitious name "John Doe" in order to protect the Plaintiff from potential career injury. *See* Order Allowing Plaintiff to Proceed under Pseudonym, Dkt. No. 5

1

scheme. *See* Declaration of Gregory M. Nespole ("Nespole Decl."),  Ex. A.

Defendants now argue that the law offers DOE no protection. For example, Defendants claim that the DFA – a sweeping, historic piece of legislation aimed squarely at the culture of corruption and cover-up that led to the 2008 financial crisis – leaves an individual such as DOE unprotected from retaliation for internal reporting of corporate fraud and malfeasance, even when that whistleblower provides unique and material information to the SEC that leads to significant monetary fines and penalties. Defendants argue that *any* employer – corporate or individual – may, directly or indirectly, suspend, threaten, harass and terminate a whistleblowing employee without violating the DFA, so long as the employer acts quickly and retaliates against him before he reports his concerns to the SEC. Not surprisingly, this absurd argument has been squarely rejected by every Court in this Circuit.

The Defendants also argue that individuals personally responsible for the wrongdoing can shirk responsibility because they are not "employers" under the DFA. However, the statutes most closely related to the DFA – the Sarbanes-Oxley Act of 2002 ("SOX") and the Fair Labor Standards Act ("FLSA") – use the word "employer" to refer to both entities and individuals; thus negating this argument.

According to Defendants, New York State law is similarly impotent. To dismiss DOE's claims for breach of contract and the covenant of good faith and fair dealing, Defendants repeatedly invoke the magic words "at-will employee" as a license to retaliate against whistleblowing employees. Such an argument ignores New York common law on implied employment contracts and asks the Court to hold that a company may retaliate against its employees for adhering to *mandatory* internal policies and codes of conduct requiring the reporting of illegal activities. This position would put employees in the untenable position of

2

risking termination (without recourse) whether they follow internal company policies regarding the reporting of illegal activities or flout them.

Finally, Defendants argue that Plaintiff cannot plead tortious interference and *prima facie* tort claims because elements of these torts are inconsistent with elements of other causes of action in the Complaint. However, Fed. R. Civ. P. 8(d) allows Plaintiffs to plead alternate theories of liability "regardless of consistency."

## II.     STATEMENT OF FACTS

### A.     *John Doe's Employment With The Corporate Defendants*

In December 2009, DOE was hired by OAM as a Private Equity Analyst on its Private Equity Team, where he focused on energy and energy related investments. Compl. ¶21. DOE's offer letter included promises of deferred compensation tied directly to performance. Compl. ¶66. The offer letter stated that he would be eligible for a "discretionary bonus ... related to subsequent performance." Declaration of Christopher Wasil ("Wasil Dec."), Ex. A.

In addition, as a term of DOE's employment, he was required to comply with a Code of Business Conduct and Ethics for Directors, Officers, and Employees ("Code" or "Code of Conduct") which *mandated* employee reporting of illegal or unethical conduct, and purported to protect the employment and careers of employees who did so.[2] *See* Nespole Decl., Ex. B. Specifically, Section 3 of the Code requires employees to "know, respect and comply with all laws, rules, and regulations applicable to the conduct of Oppenheimer's businesses," while the Introduction to the Code states that:

---

[2] In asking the Court to consider DOE's offer letter (not attached to Complaint) as evidence of an at-will employment relationship, Defendants have argued that the specific terms of Plaintiff's employment are "integral to the complaint." Defendants' Memorandum ("Def. Mem.") at 3 n.4. Similarly, documents which restrict the Corporate Defendants ability to discipline or terminate DOE also make up the specific terms of his employment and are "integral" to the allegations in the Complaint. In the event that the Court is not inclined to take notice of the DOE's offer letter or Code of Conduct and intends to dismiss certain claims in whole or part based upon a supposedly at-will employment relationship, Plaintiff respectfully requests leave to amend the Complaint.

You are *required* to read the Code each year and to acknowledge, in writing, that you have done so, that you have followed the Code and that *you have reported any actual or perceived breach of the Code of which you become aware.* (Emphasis added.)

Section 11 of the Code assures employees that they "*will be protected by Oppenheimer from retaliation or reprisal* if [they], in good faith, report actual, suspected, or perceived breaches of the Code[.]" (Emphasis added.)

By all objective criteria, DOE's performance at OAM was outstanding. Compl. ¶ 21. In 2010 he sourced OAM's first direct private equity offerings in the energy sector, obtaining over $50 million in capital commitments. *Id.* In 2011, he co-authored the private placement memorandum for Oppenheimer Drilling Partners, which quickly became the Private Equity Team's most profitable endeavor. *Id.* DOE received glowing performance reviews throughout 2010 and a bonus in the first quarter of 2011 equal to 110% of his base salary. *Id.* After little more than 12 months on the job, DOE was given an off-cycle promotion to Associate Director in April 2011. *Id.* ¶ 22.

### B.    *The Valuation Of The OGR Fund*

Among the various funds managed by the Private Equity Team was the OGR Fund. *Id.* at 23. The OGR Fund's stated investment objective is "to provide income and long-term capital appreciation by investing ... within developed and developing market countries managed by experienced teams capable of generating superior returns." *Id.*

The OGR Fund's audited financial statements show that as of December 31, 2008, 41.3% of the OGR Fund's capital was invested in the private equity fund Cartesian Investors-A, L.P. ("Cartesian"). *Id.* ¶ 25. The assets of Cartesian consisted solely of shares in S.C. Fondul Proprietatea SA ("Fondul"). *Id.* Because such a high percentage of the OGR Fund's capital was committed to Cartesian, any untrue statements regarding Cartesian or the value of its Fondul

4

assets would have a material effect on the OGR Fund's value and on potential investors' consideration of the Fund's profitability. *Id.*

Fondul shares have a nominal or "par value" of 1.0 Romanian Leu ("RON"), but these shares have always traded at a fraction of par value. *Id.* ¶ 26. Throughout the relevant period, Fondul shares never traded anywhere close to their par value. *Id.* As such, the OGR Fund initially valued its holdings in Cartesian/Fondul based upon the underlying fund manager's estimated value (not par value), which was based upon the "at cost" valuation supplied by Fondul's Investment Manager, Pangaea One, L.P. *Id.* ¶ 27. This valuation policy was consistent with the OGR Fund's clearly articulated policy in the Fund's marketing materials, which states: "the General Partner expects that in most cases it will value the Underlying Funds in accordance with the valuations reported to it by the Managers of the Underlying Funds," and that "[a]s a fund of funds, we require our underlying fund managers to utilize third party valuation firms that provide valuations of the respective portfolios in accordance with FASB 157." *Id.*

### C. *Plaintiff Uncovers Fraudulent Marketing Practices For The OGR Fund*

In 2011, DOE learned that his direct supervisor – Williamson – had been improperly inflating the value of the OGR Fund's holdings in Cartesian/Fondul. *Id.* ¶¶ 28, 35. Specifically, DOE learned that Williamson had begun to fraudulently promote and market the OGR Fund by valuing its holdings in Cartesian/Fondul at the arbitrarily assigned "par" values rather than market price or the value set by the Cartesian/Fondul fund manager. *Id.* ¶ 36. Valuing these assets at par value was in violation of the OGR Fund's valuation policy. *Id.* ¶¶ 36-37.

DOE discovered that this change in valuation methodology caused the return of the OGR Fund to be vastly overstated. *Id.* ¶ 31. For example, on October 7, 2009, Williamson distributed to ***current*** investors in the OGR Fund a Q2 2009 Quarterly Package (the "Q2 2009 Report"),

containing the following chart: *Id.*

| Oppenheimer Global Resource Private Equity Fund June 30, 2009 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Fund Name | Commitment Date | Committed Capital | Contributed Capital | % Capital Contributed | Realized Proceeds | Net Asset Value* | Net Multiple | Net IRR (%) |
| Blue Tip Energy Partners Fund I, L.P. | Apr-08 | $ 7,000,000 | $ 2,403,032 | 34% | $ 10,613 | $ 2,118,146 | 0.9x | -13.1% |
| Cartesian Investors-A, L.P. | Jun-08 | $ 7,000,000 | $ 6,196,464 | 89% | $ 95,313 | $ 6,050,890 | 1.0x | -1.0% |
| Starwood Energy Infrastructure Fund I, L.P. | May-08 | $ 7,000,000 | $ 1,050,000 | 15% | $ - | $ 950,947 | 0.9x | -18.3% |
| Tripod Capital China Fund II, L.P. | Oct-08 | $ 7,000,000 | $ 4,210,874 | 60% | $ - | $ 4,999,930 | 1.2x | 40.0% |
| Total - Net to Fund | | $ 28,000,000 | $ 13,860,378 | 50% | $ 105,926 | $ 14,119,713 | 1.02x | 3.8% |
| Net to Limited Partners | | | | | | | 0.95x | -6.3% |

\* Net Asset Values are based on the underlying managers' estimated values as of June 30, 2009.

Thus, ***current*** investors in the OGR Fund were informed that Cartesian showed an internal rate of return of -1% and a net asset value of $6,050,690 as of June 30, 2009. *Id.* This valuation reflected the underlying fund manager's at-cost valuation of the Fondul shares. *Id.* Using this valuation of Cartesian, the OGR Fund displayed a net loss to investors of -6.3%. *Id.*

Shortly after the release of the Q2 2009 Report, and without informing investors, Williamson fraudulently changed the valuation methodology for the Cartesian holdings in order to facilitate a marketing initiative to ***prospective*** investors. *Id.* ¶ 32. Williamson did this by valuing the Cartesian holdings at their par value of 1.00 RON, while Fondul shares were being valued at cost by the fund's manager and trading over-the-counter for less than 0.25 RON. *Id.* Thus, a PowerPoint presentation distributed to ***potential*** investors for the same period claimed:

| Oppenheimer Global Resource Private Equity Fund June 30, 2009 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Fund Name | Commitment Date | Committed Capital | Contributed Capital | % Capital Contributed | Realized Proceeds | Net Asset Value* | Multiple | IRR (%) |
| Blue Tip Energy Partners Fund I, L.P. | Apr-08 | $ 7,000,000 | $ 2,403,032 | 34% | $ 10,613 | $ 2,118,146 | 0.9x | -13.1% |
| Cartesian Investors-A, L.P. | Jun-08 | $ 7,000,000 | $ 6,196,464 | 89% | $ 95,313 | $ 9,272,956 | 1.5x | 67.0% |
| Starwood Energy Infrastructure Fund I, L.P. | May-08 | $ 7,000,000 | $ 1,050,000 | 15% | $ - | $ 950,947 | 0.9x | -18.3% |
| Tripod Capital China Fund II, L.P. | Oct-08 | $ 7,000,000 | $ 4,210,874 | 60% | $ - | $ 4,999,930 | 1.2x | 40.0% |
| Total | | $ 28,000,000 | $ 13,860,378 | 50% | $ 105,926 | $ 17,341,979 | 1.3x | 33.3% |

\* Unrealized Values are based on the underlying managers' estimated values as of June 30, 2009.

This chart is in nearly all ways identical to the chart featured in the Q2 2009 Report. *Id.* ¶ 32. It offers OGR Fund performance up to June 30, 2009. It contains identical values for Blue Tip Energy Partners Fund I, L.P., Starwood Energy Infrastructure Fund I, L.P., and Tripod Capital China Fund II, L.P. *Id.* However, one difference is immediately apparent: ***Cartesian shows an IRR of positive 67%, rather than negative 1% and an asset value of $9.27 million instead of $6.05 million.*** *Id.* Using these numbers, the OGR Fund as a whole shows a ***positive*** IRR of 38.3% rather than a ***negative*** IRR of 6.3%. *Id*

As mandated by the Corporate Defendants' Code of Conduct, DOE promptly and in good faith reported this fraudulent practice to his employers through internal channels, including through email communications with Vineet Bhalla, the Chief Financial Officer of OAM. *Id.* ¶¶ 38-39. DOE also brought his concerns directly to Williamson and others in the Private Equity Group. *Id.* ¶ 39. Shortly thereafter, Williamson placed a job posting on the Internet seeking applications for DOE's position. *Id.* Williamson then fired Plaintiff on the false pretext that he forged Williamson's digital signature on expense reports. *Id.* ¶¶ 40-41.  This accusation was later proven false when DOE produced to McGuire and others an email confirming that his use of Williamson's digital signature had been authorized. *Id.*

McGuire, OPCO's Deputy General Counsel and Director of Litigation, contacted DOE on June 1, 2011 after DOE emailed OAM's President, Tom Robinson, about his retaliatory termination. *Id.* ¶ 41. McGuire told DOE that he believed DOE had been suspended – not terminated – and that one reason for this suspension was that DOE had, without authorization, signed certain paperwork necessary for an investment in Triangle Petroleum. *Id.* In fact, Williamson had specifically authorized DOE to sign such paperwork and DOE had done so in the past without any objections from Williamson.  *Id.*

A few days later, DOE provided McGuire with additional information about the overvaluation of Fondul assets. *Id.* ¶ 42. However, DOE's concerns fell upon deaf ears. *Id.* In fact, during these communications, McGuire rejected DOE's allegations out of hand and falsely accused DOE of trying to steal business from his employers and even claimed that DOE had committed insider trading. *Id.* Based upon this pretext. McGuire strongly advised DOE to resign in order to avoid the stigma of being fired for cause. *Id.* Plaintiff appealed further to other executives, including Steven Beach, OAM's Chief Compliance Officer and Tom Robinson, OAM's President. *Id.*, ¶¶ 41-44. He also sent a long and detailed email to OPCO Chairman Albert Lowenthal explaining the improper overvaluation of the OGR Fund's assets in Fondul. *Id.* ¶43.

A few days later, DOE met with McGuire and other OPCO executives. *Id.* ¶ 44. He continued to communicate with McGuire following that meeting. *Id.* ¶¶ 45-46. Instead of taking DOE's concerns seriously, McGuire rejected Plaintiff's findings and accused DOE of, among other things, being ignorant of "rudimentary fact[s]" regarding valuation methodology for closed-end private equity investments,[3] motivated by personal animus towards Williamson, and violations of, among other things, the Corporate Defendants' policies regarding solicitation of clients and (criminal) insider trading. *Id.* ¶¶ 42, 46-47. All of these allegations were pretextual and merely an attempt to, directly or indirectly, harass, threaten and intimidate DOE and force him to resign. *Id.* ¶ 42.

When DOE refused to resign, McGuire attempted to renegotiate the terms of his employment, informing DOE that he could return to OAM but only in an inadequate back-office position entirely unrelated to his experience, skills and career track. *Id.* ¶¶ 44-46. When DOE refused this inadequate position, McGuire terminated his employment. *Id.* ¶ 45. As such, DOE

---

[3] The fact the Defendant McGuire, OPCO's Deputy General Counsel, would have been unconcerned about the OGR Fund, in essence, keeping two sets of books with differing valuation methodologies – one for existing investors and one for prospective investors – is, to say the least, highly troubling.

was terminated for following a mandatory company policy outlined in the Corporate Defendants' Code of Conduct regarding the reporting of illegal activity, and was denied the protections promised to those reporting such activity. In addition, DOE did not receive any prorated performance bonus for work performed prior to his termination and there was no assessment as to whether the quality of his work would have merited such a prorated bonus. Compl. ¶ 68.

Having exhausted his attempts to correct Williamson's fraud and protect OGR Fund investors through internal channels, DOE reported the matter to the SEC and the Mass AG's Office. *Id.* ¶¶ 48-50. The subsequent investigations by these entities vindicated DOE's concerns regarding the valuation practices for the OGR Fund. *Id.* ¶ 51. In fact, on or about March 11, 2013, OAM and an affiliate corporation consented to the entry of an Administrative Order requiring OAM and its affiliate to distribute a total of $2,269,098 to a disgorgement fund to be used to compensate OGR investors who invested in the OGR Fund from October 2009 through June 2010. *Id.* ¶ 52. In addition, OAM and its affiliate agreed to pay civil monetary penalties of over $600,000. *Id.* Later, Defendant Williams would also reach a settlement with the SEC which included fines and a lifetime ban from working as an executive in a publically traded company. *Id.* ¶ 56.

On June 4, 2014, the SEC issued a Final Order awarding DOE and a second whistleblower, in the aggregate, an amount equal to 30% of the SEC's recovery from OAM for violating the federal securities laws – based upon the exact same conduct which DOE reported to McGuire in 2011. Nespole Decl., Ex. A.  In total, DOE will personally receive over $440,000 (the maximum amount allowable) for his material assistance to the SEC. *Id.*[4]

---

[4] The Defendants chide DOE for "waiting two and a half years to bring this action." *See* Def. Mem. at 4. But DOE was not idle during this time, as he was actively assisting both the SEC and the Mass AG's Office in their prosecutions related to the OGR Fund. Moreover, DOE provided substantial assistance to a class of investors who brought a lawsuit against OAM and OPCO, charging that these companies violated Section 12(a)(2) of the Securities

## III.   ARGUMENT

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) must be denied when a complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[5] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Given the Rules' simplified standard for pleading, '[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002) (internal citation omitted). Moreover, "[i]n deciding a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the complaint are accepted as true and all reasonable inferences must be drawn in the plaintiff's favor." *Sher v. Allstate Ins. Co.*, 947 F. Supp. 2d 370, 373 (S.D.N.Y. 2013).

### A.   *Plaintiff Satisfies The Definition Of "Whistleblower" In the DFA And Is Entitled To The Anti-Retaliation Protection Afforded Therein*

DOE's claims satisfy the plain language of the DFA's whistleblower provisions and he is entitled to protection against retaliation for his internal reporting of violations of the federal securities laws. Indeed, the DFA explicitly prohibits employers from retaliating against employees for making disclosures that are "required or protected" under SOX. Specifically, the DFA states, in pertinent part:

> No employer may ***discharge, demote, suspend, threaten, harass, directly or indirectly, or in any other manner discriminate against, a whistleblower*** in terms and conditions of employment because of any lawful act done by the whistleblower ... (iii) *in making*

---

Act of 1933 by misrepresenting the rate of return on the OGR Fund. This matter ultimately settled with defendants agreeing hire and maintain a relationship with an independent third party valuation firm to provide semi-annual valuations of OGR portfolio assets.

[5] The DFA retaliation claims are reviewed under Rule 8(a)'s notice pleading standard. *See Coppola v. Proulx*, 11-cv-00074, 2012 U.S. Dist. LEXIS 104792, at *4 (D. Nev. July 26, 2012) (holding that DFA retaliation claim "must satisfy the notice pleading standard of Rule 8(a)(2).").

*disclosures that are required or protected under the Sarbanes Oxley Act of 2002 ...*, the Securities Exchange Act of 1934..., and any other law, rule or regulations subject to jurisdiction of the Commission.

15 U.S.C. § 78u-6(h)(1)(A)(iii) (emphasis added).

Disclosures that are protected under SOX include information provided by an employee to any "person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct)" regarding conduct that he reasonably believes constitute violations of SEC rules or regulations, or any federal law relating to fraud against shareholders. *See* 18 U.S.C. § 1514A(a)(1)(C). As such, DOE was protected from retaliation pursuant to the DFA's (and its intended interplay with the SOX's) prohibitions against retaliation for the internal reporting of corporate malfeasance and violations of federal securities laws.

### 1.   Defendants' Argument That DOE Does Not Meet The Statutory Definition of Whistleblower Is Counter To Prevailing Case Law

Ignoring the clear edict of the DFA, the Defendants argue DOE cannot be a "whistleblower" because he did not report his concerns to the SEC until after his retaliatory suspension, harassment and eventual discharge. Def. Mem. at 11-13. Specifically, the Defendants note that under the definitional section of the DFA's whistleblower *bounty* section (not the anti-retaliation section), a "whistleblower" is "any individual who provides information relating to the securities laws to the [Securities Exchange] Commission. ..." Def. Mem. at 11. As such, Defendants conclude that the DFA permits retaliation against employees who report fraud internally, so long as the employer takes action before the employee can report his or her concerns to the SEC. *Id.* This argument has been rejected by every court in this Circuit. *See e.g., Yang v. Navigators Group, Inc.,* 13-cv-2073, 2014 U.S. Dist. LEXIS 63876, at *38 (S.D.N.Y. May 8, 2014) (internal whistleblowers are protected under the DFA); *Ahmad v. Morgan Stanley*

11

*& Co.*, 13-cv-6394, 2014 U.S. Dist. LEXIS 23543, at *11-12 n.5 (S.D.N.Y. Feb 21, 2014) (finding analysis extending whistleblower protection to those who internally report wrongdoing to be "persuasive") ; *Murray v. UBS Secs., LLC*, 12-cv-5914, 2013 U.S. Dist. LEXIS 71945 (deferring to SEC interpretation of the DFA which finds that definitional section was *not* intended to restrict whistleblower protection to only individuals who have reported wrongdoing to SEC); *Kramer v. Trans-lux Corp.*, 11-cv-1424, 2012 U.S. Dist. LEXIS 136939 (D. Conn. Sept. 25, 2012) (reading the DFA to protect only whistleblowers who report to the SEC "seems inconsistent with the goal of the DFA, which was to 'improve the accountability and transparency of the financial system,' and create 'new incentives and protections for whistleblowers'"); *Egan v. Tradingscreen, Inc.*, 10-cv-8202, 2011 U.S. Dist. LEXIS 47713 (S.D.N.Y. May 4, 2011) (holding that a whistleblower must directly report to the SEC to receive a bounty award from the SEC, but this is not dispositive of whether he or she is entitled to protection from retaliation).

The main support that Defendants have for their position is the Fifth Circuit's decision in *Asadi v. GE Energy (USA), LLC*, 720 F.3d 620, 629-30 (5th Cir. 2013) (holding that an employee who makes *only* an internal report is not protected under DFA) (emphasis added).[6] *Asadi*, however, is an outlier opinion and is easily distinguishable from the facts of this litigation.

As the District Court for the District of Nebraska noted in the most recent decision rejecting *Asadi:*

> [i]nternal reporting serves a number of important interests – shared by employers and the SEC. It allows companies to remedy improper conduct at an early stage, perhaps before it rises to the level of a violation ... [and] may also prevent simple misunderstandings – where an employee is mistaken, and there has been no legal violation – from transforming into investigations that waste corporate and government resources. In other

---

[6] The only other case Defendants cite to in their brief in support of this argument is *Banko v. Apple Inc.*, No. CV 13-02977 RS, 2013 WL 7394596, at *4-5 (N.D. Cal. Sept. 27, 2013). Def. Mem. at 12. Like *Asadi*, *Banko* is distinguishable because the plaintiff in *Banko never* reported the alleged illegal activity to the SEC.

words, [internal reporting] will help vet the tips to the SEC, so that the SEC receives fewer and higher quality reports from whistleblowers.

*Bussing v. Cor Clearing, LLC*, 8:12-cv-238, 2014 U.S. Dist. LEXIS 69461, at *33 (D. Neb. May

21, 2014). Thus, it is not "logical to conclude that Congress intended to encourage an across-the-board departure from the general practice of first making an internal report." *Id.* at *33. In

addition, *Bussing* held that it was necessary to give the meaning of "whistleblower" in the DFA's

anti-retaliation provision its ordinary meaning or the very purpose of the provision be frustrated:

> When it is apparent that Congress intended a word to be given its ordinary meaning, notwithstanding the presence of a statutory definition to the contrary, and when applying the definition to the provision at issue would defeat that provision's purpose, the Court will not mechanically read the statutory definition into that provision. *See Philko Aviation, Inc. v. Shacket, 462 U.S. 406,* 411-12, 103 S. Ct. 2476, 76 L. Ed. 2d 678 (1983). The Court is convinced that *§ 78u-6(h)* presents just such an unusual case.

*Id.* at *21-22.

Even if the Court follows *Asadi*, however, Plaintiff has still stated a claim under the

DFA's anti-retaliation provisions. Although *Asadi* protects only those who report to the SEC, the

decision does not require any causal link between an employee's report to the SEC and the

employer's retaliatory conduct. To the contrary, *Asadi* clearly states that the DFA protects

employees where, as here, the employee is retaliated against for an internal report, as long as the

employee *also* reports the wrongdoing to the SEC:

> Assume a mid-level manager discovers a securities law violation. On the day he makes this discovery, he immediately reports this securities law violation (1) to his company's chief executive officer … and (2) to the SEC. Unfortunately for the mid-level manager, the CEO, who is not yet aware of the disclosure to the SEC, immediately fires the mid-level manager. The mid-level manager, clearly a "whistleblower" as defined in Dodd-Frank because he provided information to the SEC relating to a securities law violation, would be unable to prove that he was retaliated against because of the report to the SEC. … *The third category of protected activity … protects the mid-level manager. In this scenario, the internal disclosure to the CEO, a person with supervisory authority over the mid-level manager, is protected* under … the anti-retaliation provision enacted as part of the Sarbanes-Oxley Act of 2002 …. Accordingly, even though the CEO was not aware of the report to the SEC at the time he terminated the mid-level manager, *the mid-level*

13

> *manager can state a claim under the Dodd-Frank whistleblower-protection provision because he was a "whistleblower" and suffered retaliation based on his disclosure to the CEO, which was protected under SOX.*

*Id.* at 627-28 (emphasis added). The plaintiff in *Asadi* – unlike the Plaintiff here – simply *never* provided information to the SEC. Thus, even if the Court were inclined to follow *Asadi*, this crucial distinction would still compel rejection of Defendants' argument.[7]

### 2. The Defendants' Argument Fails To Take Proper Deference To The SEC's Interpretation Of The DFA

The SEC has adopted regulations making clear that the anti-retaliation protections of the DFA apply to "individuals who report to persons or governmental authorities other than the Commission." SEC Securities Whistleblower Incentives and Protections, 76 Fed. Reg. 34300-01, at *34304 (2011) ("Comments to Final Rule"). In particular, the Commission clarified that the DFA's anti-retaliation provisions extended to individuals making internal reports of wrongdoing – irrespective of whether they have reported their concerns to the Commission. *Id.* Specifically, the SEC distinguishes between the bounty and anti-retaliation provisions of the DFA, as these provisions have different standards of implementation: "[t]he retaliation protections afforded to whistleblowers by the provisions of paragraph (h)(1) of Section 21F of the Exchange Act ... apply irrespective of whether a whistleblower satisfies the procedures and conditions to qualify for an award." *Egan*, 2011 U.S. Dist. LEXIS 47713, at *25.[8] The Court should defer to the agency's interpretation of the DFA whistleblower provisions. *See Chevron U.S.A. v. Natural*

---

[7] In addition, Defendants' argument ignores the most basic canon of statutory interpretation. Indeed, it is fundamental that "[a] statute should be construed so that effect is given to all of its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 317 (2009) (*quoting Hibbs v. Winn*, 542 US. 88, 101 (2004)). When Congress identified, the types of disclosures that the DFA would protect, it explicitly incorporated disclosures made by employees to their supervisors and others with authority to investigate the alleged wrongdoing. Defendants' argument that the DFA only protects disclosures made to the SEC would render 15 U.S.C. § 78u-6(h)(1)(A)(iii) a nullity. *See Murray,* 2013 U.S. Dist. LEXIS 71945 at *15-16).

[8] Interestingly, the bounty provisions of Dodd-Frank are more stringent than the protections provided in the anti-retaliation provisions. Thus, the fact that the SEC granted DOE a significant (and the largest possible) bounty should provide additional support that he is protected as a whistleblower.

14

*Resources Defense Council*, 467 U.S. 837 (1984); *SEC v. Citigroup Global Markets, Inc.*, no. 11-cv-5227, 2014 U.S. App. LEXIS 10516, at *26-27 (2d Cir. June 4, 2014) (SEC is afforded "significant deference" in matters of public interest).[9]

### B.   The Individual Defendants Are "Employers" Under The Applicable Provisions Of The DFA

The DFA's anti-retaliation provision states that "[n]o **employer** may discharge, demote, suspend, threaten, harass, directly or indirectly, or in any other manner discriminate against, a whistleblower in the terms and conditions of employment because of" the employee's whistleblowing activity. 15 U.S.C. § 78u-6(h)(1)(A). The Individual Defendants claim that they can skirt liability under this provision because individuals cannot be "employers." Def. Mem. at 5-11.   This is a question of first impression.[10]   The DFA does not define "employer" and no court has yet decided whether the term encompasses individuals. But the most closely related statutes (SOX and the Fair Labor Standards Act), DFA's legislative history, and broader policy considerations all weigh in favor of reading the statute to prohibit retaliation by both individuals and entities.

### 1.   SOX Is Interpreted Such That The Term "Employer" Includes Individuals And DFA Should Be Similarly Interpreted

Defendants concede, as they must, that SOX provides for *individual* liability for those who retaliate against whistleblowers, but then dismiss this fact as irrelevant to the Court's consideration because SOX and DFA are "separate pieces of legislation." Def. Mem. at 7. This completely ignores the history and intent of the DFA, which was designed to build upon (and not

---

[9] In order to warrant *Chevron* deference, the SEC's interpretation need only be plausible. *See Chevron*, 467 U.S. at 844; *Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 120 (2d Cir. 2007); *Murray*, 2013 U.S. Dist. LEXIS 71945, at *14. The SEC's interpretation in this instance easily surpasses that bar, and is the most logical reading of the Act. It is also the interpretation widely accepted by federal courts and every court in this Circuit to address the issue.

[10] In *Jones v. SouthPeak Interactive Corp.*, 12-cv-443, 2013 U.S. Dist. LEXIS 37999, at *26 (E.D. Va. Mar. 19, 2013), the court noted the existence of but did not reach "the question of whether Dodd-Frank authorizes suits against individual supervisors or corporate officers."

relegate) the protections afforded by SOX.[11] Indeed, the most compelling evidence of the meaning of the word "employer" in the DFA is the meaning of the term "employer" in SOX, DFA's sister statute. *See, e.g., Kramer v. Trans-lux Corp.*, 2012 U.S. Dist. LEXIS 136939, at *12 ("[T]he [whistleblower provisions of the] Dodd-Frank Act appear[] to have been intended to expand upon the protections of Sarbanes-Oxley."). Thus, in looking to define the meaning of "employer," under the DFA, the Court should look first to the use of the word "employer" under SOX. *See Wachovia Bank, NA v. Schmidt*, 546 U.S. 303, 315-16 (2006) ("under the *in pari materia* canon of statutory construction, statutes addressing the same subject matter generally should be read as if they were one law.") (internal quotations and citations omitted)); *SEC v. National Securities, Inc.*, 393 U.S. 453, 466 (1969) ("[T]he interdependence of the various sections of the securities laws is certainly a relevant factor in any interpretation of the language Congress has chosen."). As in the DFA, SOX uses the term "employer" without providing a definition. But the context demonstrates that Congress' use of "employer" in SOX is shorthand for both entities and individuals. Specifically, SOX provides that a claim under §1514A "shall be governed under the rules and procedures set forth in section 42121(b) of title 49." 18 U.S.C. § 1514A(b)(2)(A). And "[t]hroughout §42121(b), the respondent" – which may be an individual or an entity – "is referred to as 'the employer.'" *Lawson v. FMR LLC*, 134 S. Ct. 1158, 1167 (2014). There is simply no basis to believe Congress intended to have separate definitions of "employer" in these two closely-related statutes.[12]

---

[11] The Individual Defendants suggest that SOX supports their reading because SOX's detailed list of potentially liable persons ("company ... or ... officer, employee, contractor, subcontractor, or agent of such company," 18 U.S.C. § 1514A(a))) shows that "Congress knows how to include individuals if it wants." Mem. at 7. This is true in that Congress knows that a detailed list is *sufficient* to impose individual liability. But Congress also knows that a detailed list is not *necessary* to impose liability on individuals. Congress has learned that using the word "employer" without providing a definition – as in the FLSA – is an equally sufficient method of imposing individual liability.

[12] SOX's use of the undefined term "employer" to include non-wage-paying individuals such as "employees" and "agents" vitiates the Individual Defendants' argument that an "employer" must necessarily be the person who pays a plaintiff's salary. Def. Mem. at 5.

2.    The Second Circuit Interprets The Fair Labor Standards Act's Undefined
      Term "Employer" To Include Individuals

Like the DFA, the FLSA uses the term "employer" but does not define it. *See Irizarry v.
Catsimatidis*, 722 F. 3d 99, 103 (2d Cir. 2013). Given the absence of a narrower definition, the
Second Circuit has read the term "employer" in the FLSA's anti-retaliatory provisions to include
individuals. *Id.* at 105. This Court should do the same with respect the DFA.

Where the word "employer" is left undefined, "an individual within a company that
undisputedly employs a worker" can be "personally liable for damages as that worker's
'employer.'" *Catsimatidis*, 722 F. 3d at 105; *Herman v. RSR Sec. Services Ltd.*, 172 F.3d 132 (2d
Cir. 1999) (holding that an individual was an "employer" under the FLSA). In this Circuit,
"control of employees is central to deciding whether [an individual] should be deemed an
employer." *Herman* 175 F.3d at 135. In evaluating such control, the Second Circuit looks to
"operational control." *Catsimatidis*, 722 F.3d at 106.

"A person exercises operational control over employees if his or her role within the
company, and the decisions it entails, directly affect the nature or conditions of the employees'
employment." *Id.* at 110. Here, Williamson was DOE's direct supervisor. Compl. ¶¶ 11, 20. Both
Williamson and McGuire exercised supervisory control over DOE, including the power to
suspend and terminate his employment. *Id.* ¶1 3. Both Individual Defendants were able to (and
did) affect the nature and conditions of Plaintiff's employment. Williamson directly fired
Plaintiff – after falsely claiming that Plaintiff had forged Williamson's digital signature. *Id.* ¶ 40.
Plaintiff appealed this decision to other executives, including McGuire. *Id.* ¶¶ 41-44. Not only
did McGuire fail to make a *bona fide* inquiry into Plaintiff's allegations of fraud, but he accused
him of criminal wrongdoing and asked him to voluntarily resign in lieu of being terminated.
When those tactics failed, McGuire informed Plaintiff that he could return to Oppenheimer but

17

only in an inadequate back-office position. *Id.* ¶¶ 44-46. When Plaintiff refused, McGuire fired him. *Id.* ¶ 45. These actions demonstrate that both of the Individual Defendants exercised significant operational control over Plaintiff's employment.

Pointedly ignoring the FLSA, Defendants would have the Court look to the use of "employer" in Title VII and the Age Discrimination in Employment Act ("ADEA"). Def. Mem. at 8-9. But, as Defendants concede, Title VII and the ADEA—unlike the DFA, SOX, and the FLSA—both provide specific statutory definitions of "employer," which require a "minimum number of employees the employer must have." *Id.* at 8. The Second Circuit relied heavily on this minimum-size requirement – which does not appear in the DFA, SOX or the FLSA—in finding that an individual cannot be a Title VII "employer." *Tomka v. Seiler Corp.*, 66 F. 3d 1295, 1314 (2d Cir. 1995) (finding that "Congress intended to limit liability to employer-entities with fifteen or more employees.")[13] Decisions interpreting these statutes are, thus, an unreliable guide to Congress' intent in using the word "employer" without a definition.

     3.    <u>Legislative History And Broader Policy Considerations Support An Interpretation Of "Employer" That Will Deter Individual Wrongdoing</u>

The legislative history of the DFA further supports the conclusion that Congress intended to prohibit individuals from retaliating against whistleblowers. The legislators who passed the DFA were clearly focused on individual misconduct. Congress placed much of the blame for the 2008 financial crisis on "[t]raders and executives" who "got fabulously wealthy by gaming the unregulated casinos on Wall Street," "executives" who made "reckless mortgage loans," "[e]xecutives" who "packaged ... toxic securities and then took a conflict of interest position on

---

[13] The Individual Defendants make extensive use of typographic emphasis to suggest that the availability of a reinstatement remedy (rather than the minimum size requirement) was the driving force behind *Tomka*'s holding rejecting individual liability under Title VII and the similar decision in *Spiegel v. Schulmann*, 604 F.3d 72, 79-80 (2d Cir. 2010). *See* Def. Mem. at 9. But reinstatement is also available under the FLSA (*see* 29 U.S.C. § 216(b)) and this has not prevented the Second Circuit from extending the FLSA's retaliation prohibitions to individuals.

it," and "irresponsible executives who mismanaged their companies."   156 Cong. Rec. 61, S2722, S2726, S2729 (Apr. 10, 2010).  Lawmakers emphasized that the DFA reforms would "set clear standards and real enforcement," including "jail time for executives," in order to "curb … fraud, manipulation, and riotous speculation[.]"  156 Cong. Rec. 105, S5912 (July 15, 2010).

Finally, broader policy considerations embodied in the "cat's paw" doctrine weigh in favor of interpreting the DFA's anti-retaliatory provisions to govern individuals.[14]  A number of courts, including the Eastern District of New York,[15] and five Circuit Courts,[16] have recognized that a cat's-paw theory justifies imposing liability on individuals who (motived by unlawful animus) convince their superiors to take adverse employment action against another employee. As the Seventh Circuit put it in *Smith v. Bray*, this "makes sense as a matter of basic fairness: why should the 'hapless cat' (or at least his employer) get burned but not the malicious 'monkey'?" 681 F. 3d 888, 899 (7th Cir. 2012). So too here, the most culpable actors are Williamson and McGuire — *i.e.*, the individuals who discharged, suspended, threatened and harassed DOE. Even if the Corporate Defendants do not contest their *respondeat superior* liability for the Individual Defendants' actions, this should not allow the Individual Defendants to evade personal accountability. *Id.* ("The cat's paw theory can support individual liability … for a subordinate employee who intentionally causes a decision-maker to take adverse action

---

[14] The "cat's paw" theory takes its name from an Aesop's fables. "In the fable, a monkey induces a cat by flattery to extract roasting chestnuts from the fire. After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing." *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1190 n.1 (2011).

[15] *Siani v. State Univ. of N.Y. at Farmingdale*, 2:09-cv-0407, 2014 BL 116994, at *25 n.13 (E.D.N.Y. Mar. 28, 2014).

[16] *See, e.g., Tejada-Batista v. Morales*, 424 F.3d 97, 102 (1st Cir. 2005); *Maestas v. Segura*, 416 F.3d 1182, 1191 (10th Cir. 2005); *Strahan v. Kirkland*, 287 F.3d 821, 826 (9th Cir.2002); *Darnell v. Ford*, 903 F.2d 556, 561-62 (8th Cir. 1990); *Saye v. St. Vrain Valley Sch. Dist. RE-1J*, 785 F.2d 862 (10th Cir.1986); *Professional Ass'n of Coll. Educators v. El Paso County Cmty. Coll. Dist.*, 730 F.2d 258, 266 (5th Cir.1984).

against another employee in retaliation for statutorily protected activity.").[17]

### C.   The Corporate Defendants Breached Their Employment Contract With Plaintiff, Including The Implied Covenant Of Good Faith And Fair Dealing

As Defendants concede, an employee may assert a breach-of-contract action "when [he] can show that the employer made its employee aware of an express written policy limiting the right of discharge[.]" Def. Mem. at 13 (quoting *Lobosco v. N.Y. Telephone Co./NYNEX*, 96 N.Y.2d 312, 316 (2001)); *see also Cruz v. HSBC Bank, USA, NA*, 12-cv-6088, 2014 U.S. Dist. LEXIS 32042, at *7 (E.D.N.Y. Mar. 10, 2014) ("New York law does recognize a claim for termination of an employee at-will if there is an express limitation on an employer's ability to terminate an employee."). The terms of Plaintiff's employment include the Code of Conduct, in which the Corporate Defendants agreed that Plaintiff (or any employee) could not be terminated for reporting illegal activity. The Corporate Defendants' express promise in this regard distinguishes this case from those cited by Defendants. Here the Corporate Defendants agreed to protect Plaintiff from retaliation and then breached that agreement when Plaintiff made an accurate report of serious wrongdoing.[18]

In addition, the Corporate Defendants breached Plaintiff's employment contract by failing to pay DOE deferred compensation owed in the form of a performance-based bonus. Specifically, the Complaint alleges that Plaintiff's employment contract "included promises of deferred compensation tied directly to performance." Compl. ¶ 66. As retaliation for Plaintiff's

---

[17] As this Court noted in *Kregler v. City of New York*, "[t]he Second Circuit has not ruled on the issue of cat's paw liability ... However, several cases in district courts in this Circuit have considered the application of the cat's paw theory of liability ... and these cases generally endorse the cat's paw theory." 08-cv-06893, 2013 U.S. Dist. LEXIS 176091, at *21 (S.D.N.Y. Dec. 09, 2013) (collecting cases).

[18] The Corporate Defendants' express promise distinguishes this case from the cases they cite: *Sabetay v. Sterling Drug, Inc.*, 69 N.Y.2d 329 (1987) and *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293 (1983). Def. Mem. at 14-15. In *Sabetay*, unlike here, the plaintiff "failed to demonstrate a limitation by express agreement on his employer's unfettered right to terminate at will." 69 N.Y.2d at 336. Similarly, in *Murphy*, the court found "no evidence of any such express limitation." 58 N.Y.2d at 305. Here, by contrast, the Corporate Defendants agreed to protect Plaintiff from retaliation and then breached that duty when Plaintiff made an accurate report of serious wrongdoing.

20

whistleblowing, the Corporate Defendants "refus[ed] to pay monies due under their agreement related to deferred compensation in the form of prorated performance bonuses." *Id.* ¶ 68. Corporate Defendants' only response to Plaintiffs' deferred-compensation claim is to assert that these allegations are somehow insufficiently detailed to put Defendants on notice of the claim against them. *See* Def. Mem. at 14 fn.8. This argument cannot withstand serious scrutiny.[19] In support of their Motion, Defendants included the full offer letter that sets forth these promises and the Code was drafted by Oppenheimer. *See* Wasil Dec., Ex. A (offer letter stating that Plaintiff will be eligible for a "discretionary bonus … related to subsequent performance.").

As Judge Sand recently held in *Ashmore v. CGI Group, Inc.*, a whistleblower can maintain a claim for breach of contract against a former employer who fails to pay a bonus that was contractually linked to performance. *See Ashmore v. CGI Group, Inc.*, 11-cv-8611, 2012 U.S. Dist. LEXIS 82598, at *25-26 (S.D.N.Y. June 12, 2012) ("[B]y linking the receipt of a bonus to [the employee's] job performance … the language quoted above … suggests that [the employer's] discretion was constrained … [The employee] can as a result maintain a claim for breach of contract under New York law.").[20] Defendants have identified no contrary authority.

Finally, the Corporate Defendants breached the implied covenant of good faith and fair dealing by forcing Plaintiff to choose between his job, and the ethical standards of his profession (including compliance with the federal securities laws). Defendants are wrong that there can be no implied covenant of good faith and fair dealing in employment contracts. Def. Mem. at 14.

---

[19] Even if the Court were inclined to agree with Defendants, Plaintiff could easily amend the complaint to add additional details.

[20] A number of other decisions cited in *Ashmore* support the same proposition. *Fishoff v. Coty Inc.*, 634 F.3d 647, 653-54 (2d Cir. 2011) (under New York law, "[d]iscretion to modify or cancel an incentive . . . will not be implied if there exists no explicit contractual provision assigning the employer *absolute* discretion to pay such compensation") (emphasis added); *Culver v. Merrill Lynch & Co.*, 94-cv-8124, 1995 U.S. Dist. LEXIS 10017, at *9–10 (S.D.N.Y. July 17, 1995) (refusing to dismiss a breach of contract claim when "[n]othing in the language of this compensation plan, we believe, makes it absolutely clear that [the employer] was to have complete discretion in determining whether to award any compensation to Culver for services rendered").

21

To the contrary, as the Second Circuit recognized in *Wakefield v. Northern Telecom, Inc.*, New York law does provide for an implied covenant of good faith where an employment contract provides for deferred compensation (there, commissions; here, a performance-based bonus). 769 F. 2d 109, 112 (2d Cir. 1985) ("Where … a covenant of good faith is necessary to enable one party to receive the benefits promised for performance, it is implied by the law[.]").

More broadly, New York law recognizes an "implied obligation of good faith and fair dealing" where an employer has forced an employee to "choose between continued employment and his own potential suspension and disbarment" for violating "the ethical standards of the profession."[21] *Wieder v. Skala*, 80 N.Y. 2d 628, 636-38 (1992) ("Insisting that [while] in their employ plaintiff must act unethically and in violation of one of the primary professional rules amounted to nothing less than a frustration of the only legitimate purpose of the employment relationship.").[22]

### D.    *Plaintiff Is Entitled To Plead Tortious Interference As An Alternative Claim*

The Individual Defendants cite *McHenry v. Lawrence*, 66 A.D.3d 650, 651 (2d Dep't 2009) and *Ingle v. Glamor Motor Sales, Inc.*, 73 N.Y.2d 183, 188-89 (1989) for the inarguable proposition that Plaintiff cannot repackage an invalid claim for breach of an at-will employment contract as a tortious interference claim. But, unlike in *McHenry* or *Ingle*, for all the reasons set forth above, Plaintiff was not simply an at-will employee of the Corporate Defendants. Rather, DOE's contract was expressly limited by a promise to protect him from retaliation for reporting

---

[21] As the *Wieder* court expressly recognized, *Murphy* and *Sabetay* are distinguishable on this ground. *Id.* at 638 ("The company rules underlying the firing of *Murphy* and *Sabetay* were not, as in this case, general rules of conduct and ethical standards governing both plaintiff and defendants[.]"). In *Goldberg v. Four Seasons Nursing & Rehab. Ctr.*, unlike here, there was no "written policy limiting defendants' right to discharge its employees at will." 45151/03, 2004 N.Y. Misc. LEXIS 2866, at *3 (N.Y. Sup. Ct. Dec. 30, 2004).

[22] Note that Williamson was permanently barred from the securities industry for the conduct that Plaintiff reported. Compl. ¶ 56. Had Plaintiff failed to report Williamson's scheme, he risked the same sanction. The Corporate Defendants, therefore, presented Plaintiff with the same Faustian choice as the plaintiff in *Wieder*: the loss of "continued employment" or "potential suspension and disbarment" from his chosen profession.

misconduct. Williamson and McGuire tortiously interfered with that contract by directly or indirectly, harassing, threatening, suspending, and terminating Plaintiff.

In their argument for dismissing Plaintiff's tortious interference claim, the Individual Defendants do not appear to contest the existence of a contract between Plaintiff and the Corporate Defendants. Rather, the Individual Defendants assert three rather inconsistent arguments: (1) an at-will employee *cannot* bring a claim for tortious interference (Def. Mem. at 15); (2) the Individual Defendants were acting within the scope of their employment (*id.* at 16); and (3) an at-will employee *can* bring a claim for tortious interference, but only where he demonstrates that the defendant used "wrongful means" to effect the termination (*id.* at 17).

The first and third arguments can be easily disposed of. As Defendants concede, an at-will employee *can*, in fact, "establish a claim for tortious interference" by demonstrating "that the defendant utilized wrongful means to effect his termination." *Id.* at 17 (quoting *Nelson v. Cap. Cardiology Assocs., P.C.*, 97 A.D.3d 1072, 1074 (3d Dep't 2012)). Similarly, as Defendants acknowledge, a "crime" can constitute "wrongful means." *Id.* at 17 (quoting *Nelson*, 97 A.D.3d at 1074). And while the DFA provides for civil penalties only, SOX imposes criminal liability for the retaliatory discharge of a whistleblower. 18 U.S.C. § 1513(e).

The second argument—that the Individual Defendants were acting within the scope of their employment—presents a more complicated question. If Defendants are conceding that every action that the Individual Defendants took was, in fact, within the scope of their employment and that the Corporate Defendants have *respondeat superior* liability for all of the Individual Defendants' actions, including the Individual's unfounded accusations of forgery, improper solicitation of OAM clients and insider trading, then they should say so. In the face of

such a sweeping concession, the Court may properly dismiss the tortious interference count.[23]

**E.     *Plaintiff Is Entitled To Plead Prima Facie Tort As An Alternative Claim***

Finally, Defendants seek to dismiss Plaintiff's *prima facie* tort claim on the grounds that (i) their actions were not motivated solely by disinterested malevolence and (ii) their actions were not "otherwise lawful." Def. Mem. at 20-22. As above, if Defendants wish to stipulate that their actions were, in fact, not "otherwise lawful" or that their actions were, in fact, motivated by retaliatory animus, then this Count can be dismissed. In the absence of such a stipulation, however, Plaintiff is entitled to plead in the alternative. *See* Fed. R. Civ. Proc. 8(d).

Contrary to Defendants' suggestion—and unlike in *Evans v. Excellus Health Plan, Inc.*, No. 11-cv-1248, 2012 WL 3229292, at *5 (N.D.N.Y. Aug. 6, 2012) and *Hughes v. Std. Chtd. Bank PLC*, 09-cv-4595, 2010 U.S. Dist. LEXIS 38871, at *25 (S.D.N.Y. Apr. 14, 2010)[24]—Plaintiff's *prima facie* tort claim is not an attempt to "repackage a wrongful termination claim" (Def. Mem. at 21) because Plaintiff does not assert that his termination was a *prima facie* tort. Rather, the basis of Plaintiff's *prima facie* tort claim is Defendants' suspension and harassment of him and their refusal to pay Plaintiff his bonus for work performed prior to termination. *See* Compl. at ¶ 79. Plaintiff's allegation that he suffered special damages in the amount of the performance bonus that he was denied is sufficiently particularized. *See Phillips v. Vinson Supply Co.*, 581 S.W.2d 789, 791 (Tex. App. 1979) (pleading "special damages" does not "mandate allocation of

---

[23] If the Corporate Defendants wish to preserve their ability to argue that the Individual Defendants acted outside the scope of their authority, then Plaintiff is entitled to plead in the alternative. *See* Fed. R. Civ. Proc. 8(d); *Seiden Associates, Inc. v. ANC Holdings, Inc.*, 754 F. Supp. 37, 39-40 (S.D.N.Y. 1991). Unless the Corporate Defendants offer a blanket concession of *respondeat superior* liability, the precise scope of the Individual Defendants' employment is a fact-dependent question. *Piquette v. City of New York*, 4 AD 3d 402, 403 (2nd Dep't. 2004).

[24] *Evans* and *Hughes* are also distinguishable because, as explained above, DOE's at-will status was modified by the Corporate Defendants' express promise to protect him from retaliation for reporting wrongdoing.

a dollar value … it requires only that the items of damage claimed be stated.").[25]

Finally, Defendants are wrong that Plaintiffs must plead additional facts to "suggest that Mr. McGuire or Mr. Williamson acted **solely** out of 'disinterested malevolence.'" Def. Mem. at 21. There is no particularity requirement for pleading scienter for non-fraud-based claims. To the contrary, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Further discovery will undoubtedly shed further light on whether Defendants were motivated by retaliatory animus, economic self-interest, sheer malevolence, or some combination thereof. However, at this stage of the litigation, Plaintiffs have pled sufficient facts to proceed.[26] *See Pacquiao v. Mayweather*, 803 F. Supp. 2d 1208, 1214 (D. Nev. 2011).[27] The Individual Defendants' actions, which included unfounded accusations of criminal activity, as well as their failure to conduct a *bona fide* investigation into DOE's allegations, more than suggests malevolent motivations on their part.

## IV.    CONCLUSION

For all the foregoing reasons, Defendants' Motion to Dismiss should be denied. If the Motion to Dismiss is granted in any part, Plaintiff respectfully requests leave to amend.

---

[25] Neither *Hughes* nor *Jain v. McGraw-Hill Cos.*, 827 F. Supp. 2d 272, 280 (S.D.N.Y. 2011) require Plaintiff to allege a specific dollar figure. Plaintiffs in those cases simply failed to identify the item of damages to be measured. *Hughes*, 2010 U.S. Dist. LEXIS 38871, at *25 ("The amended complaint does not identify which, if any, of these amounts [of potential compensation] indicates the special damages ..."); *Jain*, 827 F. Supp. 2d at 280 (Plaintiff made only vague allegation that she has suffered "pecuniary harm, including without limitation, lost salary, bonuses, benefits and other income, as well as other damages").

[26] Defendants' fraudulent scheme certainly served their economic interest. But, unlike in *Bear Stearns Funding, Inc. v. Interface Group-Nevada, Inc.*, 361 F. Supp. 2d 283, 307 (S.D.N.Y. 2005) (cited in Def. Mem. at 22), the conduct on which DOE's *prima facie* tort claim is based—the Individual Defendants' retaliatory discharge—is not alleged to have been motivated by economic interest.

[27] *Backus v. Planned Parenthood*, is not on point, as the plaintiff there did not even make a general allegation of disinterested malevolence. 161 A.D.2d 1116, 1117 (1st Dep't 2007) ("there is no allegation or proof that defendants' sole motivation for discharging plaintiff was "disinterested malevolence"). Similarly, *Burger v. Litton Indus.*, is irrelevant to the question of the adequacy of DOE's pleading as it was a summary judgment motion and the Defendant presented uncontroverted evidence that "Burger's termination was due to downsizing." 91-cv-0918, 1996 U.S. Dist. LEXIS 5560, at *75 (S.D.N.Y. Apr. 24, 1996).

Dated: June 6, 2014

Respectfully submitted,

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

/s/ Gregory M. Nespole
Gregory M. Nespole
Benjamin Y. Kaufman
Daniel Tepper
270 Madison Avenue
New York NY 10016
Tel:  (212) 545-4600
Fax:  (212) 545-4653
Nespole@whafh.com
Kaufman@whafh.com
Tepper@whafh.com


**BLOCK & LEVITON LLP**
Jason M. Leviton
Mark A. Delaney
Joel A. Fleming
155 Federal Street, Suite 400
Boston, MA 02110
Tel: (617) 398-5600
Fax: (617) 507-6020
Jason@blockesq.com
Mark@blockesq.com
Joel@blockesq.com

*Counsel for the Plaintiff John Doe*

26